No. 5918.

P. H. CUMMINGS, JAMES H. CUMMINGS, SUBROGEE, vs. J. M. SAUX.

A contract entered into by a member of a city council, either in his own name or in the name of another person, which the charter of the city prohibits him from making, is absolutely null and void.

Promissory notes given by a vendee for the price of a thing which the vendor assumed to sell, but which never had an existence, are utterly without consideration, and can not be enforced by the vendor or by any one who has acquired them after their maturity.

Contracts having an unlawful or immoral cause are not merely void themselves, but as a rule, can not be the basis of any valid auxiliary contract.

APPEAL from the Fourth District Court, parish of Orleans. *Lynch,* J.

*Samuel P. Blanc* for plaintiff and appellant.

*Cotton & Levy* for defendant.

The opinion of the court was delivered by

SPENCER, J. On twenty-third July, 1866, the contract for repairing and keeping in repair all the ballasted and macadamized roads in the city of New Orleans was adjudicated to one M. E. Stack for a period of three years, for the sum of ten thousand five hundred dollars per annum. By private agreement one Gabriel Correjolles became half owner of this contract.

On fifteenth November, 1866, by public act Stack and Correjolles transferred their rights and obligations under this contract to the defendant, J. M. Saux, for $5000, of which $3000 was paid cash, and the balance was to be paid on terms of credit, for which credit portion J. M. Saux executed his two notes at six months, drawn to his own order and by him indorsed, each for $1000, and delivered them one to Stack and one to Correjolles.

M. E. Stack, the adjudicatee, was the son-in-law of P. H. Cummings, who was at the date of the said adjudication to Stack and at the date of said transfer to Saux a member of the City Council of New Orleans. P. H. Cummings, claiming to be owner before maturity of the note so given to Stack, instituted this suit thereon against the maker, Saux.

The defense is in substance—

First—That M. E. Stack, to whom the contract was nominally adjudicated, was in truth the mere *alter ego* of P. H. Cummings, that Cummings was the real adjudicatee through the interposition of Stack, and that said Cummings being a member of the City Council was absolutely incapable of taking said contract, and that the adjudication thereof to him was null and void, as being *in fraudem legis*, prohibited by the city charter, and against good morals and public policy.

Second—That there was no consideration, at least no lawful consideration, for said note, said Cummings being himself in truth and fact the party who received said contract from the city and conveyed it to defendant.

After the institution of this suit, P. H. Cummings, plaintiff, died, and J. H. Cummings, his son, purchased his rights therein at succession sale for one hundred dollars, and has been formally subrogated thereto.

We have examined the evidence in this case carefully, and think that it clearly establishes the following facts:

First—That P. H. Cummings was at the date of the adjudication, and at that of the transfer to Saux, of the contract with the city, a member of the City Council.

Second—That Stack was the son-in-law of P. H. Cummings, and that he was merely a person interposed to bid in said contract for Cummings, and that Cummings was the real contractor.

Third—That the conveyance and transfer made by Stack to Saux was for Cummings' benefit, and that Cummings received the entire price from Saux and Stack no part of it.

So that the only questions are: First—Was the adjudication of the contract to Cummings, he being a member of the City Council, legal, or was it null and void? Second—If said adjudication and contract were null and void did the transfer thereof constitute a good and lawful consideration for the note sued upon?

Under the view we take, the question of the right of defendant to inquire into the consideration of the note in the hands of an innocent third person does not arise, since we hold that Cummings was himself the real party vendor.

First—The city charter provides that "no member of the Common Council shall hold any other employment or office under the government of New Orleans, while he is a member of said Council, and no member

of the Common Council, or any officer of the corporation, *shall be, directly or indirectly, interested in any work, business, or contract, the expense or price or consideration of which is paid from the City treasury,* or by an assessment levied by an ordinance or resolution of the Common Council, nor be the surety of any person having a contract, work, or business with the City, for the performance of which security may be required."

This is a prohibitory statute, and the prohibition has its foundation deep down in good morals and the public interest.

The Civil Code, art. 11, provides: "Individuals can not by their conventions derogate from the force of laws made for the preservation of public order or good morals."

Article 12.—" Whatever is done in contravention of a prohibitory law, is void, although the nullity be not formally directed."

Article 1885.—" The object of contract must be possible, by which is meant physically or morally possible."

Article 1886.—" That is considered as morally impossible which is forbidden by law or morals. All contracts having such an object are void."

Considered under the light of these articles of our Code, and of the charter of the city, we do not hesitate to say that the adjudication of the said contract to Stack for Cummings was absolutely null and void, and that consequently the alleged or supposed " contract to repair the roads of the city" never had any legal existence.

Second—Was the transfer of this void and illegal contract to the defendant a good and sufficient consideration for the note sued upon? Plaintiff's counsel contends that it was, and cites several decisions in support of his proposition. He refers us to the case of the Planters' Bank vs. the Union Bank, 16 Wall. p. 499, where the Supreme Court of the United States says:

" But when the illegal transaction has been consummated, when no court has been called upon to give aid to it, when the proceeds of the sale have been actually received, and received in that which the law recognizes as having had value, and when they have been carried to the credit of the plaintiffs, the case is different. The court is then not asked to enforce an illegal contract. The plaintiffs do not require the aid of any illegal transaction to establish their case."

And again to the case of Brooks vs. Martin, 2 Wallace, p. 79, where the same court use this language :

" We think that in point of fact the allegation of the answer—that the traffic in which this firm engaged was the buying up of soldiers' claims, before any scrip or land warrants were issued, and not the purchase and sale of bounty land warrants and scrip—is true. We have

14

as little doubt that the traffic was illegal. Undoubtedly the main object of the ninth section of the act of February 11, 1847, was to protect the soldier against improvident contracts of the precise character of those developed in this record. It was a wise and humane policy, and no court should hesitate to enforce it in a case which called for its application. If a soldier, who had thus sold his claim to Brooks, Field & Co., had refused to perform his contract, or to do any act which was necessary to give them the full benefit of their purchase, no court would have compelled him to do it, or give them any relief against him. And if they had, by any such means, got possession of the land warrant or scrip of a soldier, no court would have refused, in a proper suit, to compel them to deliver up such land warrant or scrip to the soldier. Or if Brooks, after the signing of these articles of partnership, had said to Martin: 'I refuse to proceed with this partnership, because the purpose of it is illegal,' Martin would have been entirely without remedy. If, on the other hand, he had said to Martin: 'I have bought one hundred soldiers'. claims, for which I have agreed to pay a certain sum, which I require you to advance according to your agreement,' Martin might have refused to comply with such a demand, and no court would have given either of his partners any remedy for such a refusal."

We do not think these cases go to the extent that counsel claims for them, nor do we think that the doctrine maintained by them would materially help the plaintiff's case. These decisions seem to rest upon this idea expressed by the court, that "the plaintiffs do not require the aid of any illegal transaction to establish their case." Can that be affirmed of P. H. Cummings, the plaintiff in this case, under the laws of Louisiana, with the execution of which this court is charged? Under the laws of Louisiana, as we have seen, the pretended contract to repair the city roads did not exist. It never drew the breath of life. It was still-born. Yet it was for this myth that the defendant executed the note sued upon. Nobody will dispute that *the cause of Saux's obligation was this supposed contract.* We find that *the cause* of his obligation never existed—that its existence was a legal and moral impossibility.

The Civil Code, art. 1887, says: "An obligation *without a cause*, or *with a false or unlawful cause, can have no effect.*"

Article 1889.—"The cause is illicit when it is forbidden by law, when it is *contra bonos mores* or to the public order."

And yet this plaintiff is seeking at the hands of this court the enforcement of an obligation, "without a cause," or what is the same thing, "with an unlawful cause." The injunction upon this court by the laws of Louisiana is that such an obligation "can have no effect." When the laws of our own State are so plain and so mandatory in their terms; when they tell us that *the cause* of a certain obligation *does not*

exist or is unlawful, and that we shall therefore give "no effect" to it, we must not, out of regard and deference to the opinions of any tribunal, however august, administering a different code of laws, disregard the plainest provisions of our own. By the laws of Louisiana, no man can recover upon an obligation "without a cause or with a false or unlawful cause," except under certain restrictions, the bona fide third holder, before maturity, of mercantile and negotiable paper.

"An obligation must have a lawful cause. If it have an unlawful cause, or one contrary to good morals or the public order, it can not have effect and its invalidity will taint any collateral or auxiliary agreement springing from it." 1 A. 178 ; 6 R. 115.

"Articles 1885 and 1886, C. C. (old), limit the rule contained in article 1960, that no one ought to be permitted to enrich himself at the expense of another, to cases in which the alleged benefit arises from a lawful act. From unlawful acts, though they may prove beneficial to others, no rights not expressly authorized by law can arise." 3 A. 203.

So that even if it were true (which, however, it seems by the evidence not to be) that the defendant made money out of this "contract," it would be no reason why Cummings should be paid something for nothing. If the defendant received money from the city, it was in payment for his labor and material expended in repairing the city roads—a debt which the city, in equity, ought to have paid, contract or no contract.

We see no error in the judgment appealed from, and it is therefore affirmed with costs of both courts.