Cleveland, Columbus, Cincinnati and Indianapolis R'y Co. v. Closser et al.

No. 13,247.

THE CLEVELAND, COLUMBUS, CINCINNATI AND INDIAN-
APOLIS RAILWAY COMPANY v. CLOSSER ET AL.

COMMON CARRIER.—*Rebate to Shipper.—Contract Providing for.— Validity of.*—A contract entered into between a railroad company and a firm engaged in the grain business, whereby the railroad company agreed to transport grain for said firm between certain points at a certain price per hundred weight, the said firm stipulating, however, to pay a greater price per hundred weight, it being agreed that said firm should be entitled to a certain rebate per hundred weight, to be repaid promptly to said firm after such shipment, is valid. Such a contract is, in contemplation of law, nothing more than an agreement to carry the grain at the compensation ultimately agreed upon, inasmuch as the provision binding the carrier to pay back part of the nominal compensation, simply fixes the amount of actual compensation, although provision is made for a peculiar mode of payment.

SAME.—*Rebate to Shipper.— When Contract Providing for is Illegal.*—A contract giving a special rate to a shipper, and providing for a drawback, is not in itself illegal and void. To have that effect other elements must enter into the contract; but when such elements are present in such form, as to make the discrimination unjust or oppressive, the contract will be illegal.

SAME.—*Freight Rates.—Maintenance of by " Pool."—Illegality of.*—A contract entered into between competing common carriers for the establishment and maintenance of freight rates, forming what is known as a " pool," being a combination for no other purpose than that of stifling competition, and providing means to accomplish that purpose, is illegal. Such a combination being void, any one of the associated carriers has a right to provide by special contract for a special rate to a shipper, and such contract will be upheld when no element of partiality, oppression, or improper favoritism entered into the contract.

SAME.—*Rebate.—Special Contract with Shipper.—Duty of Carrier as to.—Right of Shipper to Recover.*—If a common carrier makes a special contract to repay part of the sum received from the shipper, he must perform his part of the contract, unless he overthrows the presumption of fairness and right by countervailing facts. It is not necessary for the shipper to prove that the rate charged and paid by him, under his contract, was excessive or unjust. His right to recover rests upon the contract providing for a drawback.

SAME.—*Quantity of Grain to be Shipped.—Silence of Contract as to.—Contract not Invalid.—Revocation of Contract.*—A contract binding a carrier to transport as many car loads of grain as the shipper may desire trans-

Cleveland, Columbus, Cincinnati and Indianapolis R'y Co. v. Closser *et al.*

ported, is not ineffective, for the reason that the shipper is under no obligation to ship any definite or designated quantity of grain. Possibly such a contract may be revoked, but if acts are done in performance it is, at all events, valid as to those acts, for until there is an effective revocation the contract remains in force. A proposal, although revocable in its nature, becomes effective if accepted and acted upon before annulled by revocation.

SAME.—*Principal and Agent.—Evidence.*—Where the evidence shows that the carrier forbade the allowance of drawbacks on grain shipped by the plaintiffs to G. & F., and there is evidence tending to show that thereafter a person representing the company, and one, too, who had acted for the carrier in making former contracts with the plaintiffs, entered into a contract as to rebates with the plaintiffs subsequent to said notice of interdiction on the part of the carrier, treating the notice referred to as ineffective and inducing the plaintiffs to believe that it had no force, a verdict allowing the plaintiffs a rebate on grain shipped by them to said G. & F. subsequent to said order of interdiction, will not be disturbed.

SAME.—*Testimony of Agent.—Admissibility of.*—Where the evidence shows that S. was more than a special agent of the carrier, and that his authority respecting contracts for freight was of wide scope, and that the claim of the plaintiffs for the drawback or rebate was presented to S. as the representative of the carrier at Indianapolis, and that communications concerning the claim were made to him, and that he conducted the general negotiation by correspondence with his principals, and by interviews with the plaintiffs, it was competent for C., one of the plaintiffs, to detail statements made to him by S. in reference to said matter.

SAME.—*Agent.—Authority.—Scope of.—Declarations of Agent as to Past Transaction.*—Where authority is delegated to an agent to transact business, and that business requires continuous negotiations, or is a business not fully ended by a single act, but requires a series of acts to complete it according to the intention of the parties and commercial usages, the authority of the agent does not expire with the performance of one act, although that act may be of prime importance. The same rule prevails where the agent is authorized to conduct a single transaction, for as to that transaction, he is a general agent invested with full authority to perform all acts necessary to fully consummate the transaction. This rule, however, does not permit the declaration of an agent narrating a past transaction to be given in evidence.

EVIDENCE.—*Testimony.— What Necessary to Entitle it to Admission.*—It is sufficient to entitle testimony to admission that there is some evidence, direct or circumstantial, tending to make it competent. It is not necessary that the connecting evidence should distinctly establish the facts which give the character of competency to the testimony.

PRACTICE.—*Production of Books and Papers.—Order for.—Party Complaining*

Cleveland, Columbus, Cincinnati and Indianapolis R'y Co. v. Closser et al.

*of Order.—Remedy of.*—Where a motion is sustained requiring a party to produce certain books and papers, the party is not bound to disregard the order of the trial court, suffer for the disobedience and then seek redress by appeal. Having objected in due season, in proper mode, and having appropriately saved an exception, all was done that could be legally required to be done in order to present the question on appeal.

SAME.—*Production of Books and Papers.— Use of Directed by Court.—Presumption on Appeal.*—If instruments of evidence are used in the mode required by law, it can not be said that there was prejudicial error, although the notice for their production may have been defective, or the order upon it too broad. Where, after a general order for the production of books and papers, the court directed what use should be made of the same, and there is nothing to show that the direction was not an appropriate one, or that it was not fully obeyed, it must be presumed on appeal that there was no irregularity or error in the ultimate action of the trial court.

SPECIAL FINDING.—*Must be Considered as a Whole.*—A special finding like a special verdict, or a series of instructions, must be considered as a whole, and it can not be dissected into fragmentary parts and successfully assailed in detail. One part may be considered in connection with other connected parts, or parts referring to the same transaction, and if taken as a whole the finding legitimately supports the judgment it will be upheld.

SAME.—*Sufficiency of.*—It is sufficient if in a special finding the substance of the issue is established, and a finding containing more facts than the plaintiff is required to prove is not ill provided the facts are connected with the main issue, support it, and do not establish a distinct and independent cause of action.

From the Marion Superior Court.

*H. H. Poppleton, A. C. Harris* and *W. H. Calkins,* for appellant.

*B. Harrison, W. H. H. Miller, J. B. Elam* and *J. Kopelke,* for appellees.

ELLIOTT, J.—The appellees were partners, under the name of Closser & Co., and as such prosecute this action against the appellant. They base their right of action upon contracts made with the appellant wherein it undertook to transport grain from Indianapolis to the seaboard, and they charge that the appellant agreed to receive, at the time of the shipment, a designated sum as compensation for the transporta-

tion of the grain, and to refund to them a certain part of the sum received. They demand that the appellant be compelled to respond in damages for a breach of the agreement to refund part of the money paid to it as freight on the grain carried under the contracts.

In the first paragraph of the complaint it is alleged that on the 15th day of September, 1884, the appellant made a contract with Closser & Co. wherein it agreed to transport grain from Indianapolis to Philadelphia " at the price of 16½ cents per hundred weight, at the same time stipulating that Closser & Co. should pay the defendant at the rate of 21 cents per hundred weight, but should be entitled to a rebate of 4½ cents per hundred weight, to be repaid to Closser & Co. promptly after such shipments."

The contract described is valid. It is not different, in any material respect, from the ordinary one in which the carrier stipulates directly to carry goods at a fixed rate, for the agreement to repay does not of itself change the legal effect of the undertaking to such an extent as to transform it into an illegal contract. It is, in contemplation of law, nothing more than an agreement to carry the grain at the compensation ultimately agreed upon, inasmuch as the provision binding the carrier to pay back part of the nominal compensation simply fixes the amount of the actual compensation, although it does provide for a peculiar mode of payment. There is no element of moral or legal wrong in an agreement to repay part of the compensation received ; to give an illegal character to such an agreement more must be shown than the mere fact that the parties stipulated for a rebate. In simply making a rebate, or in providing for a drawback, parties violate no law, and their contract must stand. It can not be presumed that fraud was intended, or practiced, nor can it be presumed that there was any wrongful combination to secure an undue advantage over other shippers ; neither can it be presumed that in stipulating for a rebate the carrier intended to make, in favor of the particular shipper, a discrimination forbid-

den by law. It is, by no means, every favor shown a particular shipper, although it may constitute, in some measure, a discrimination favorable to him and unfavorable to other shippers, that impresses upon a contract for the carriage of goods the seal of condemnation. The common law authorities (and by them this case is ruled) fully support the doctrine that a mere discrimination will not invalidate a contract; to have that effect other elements must enter into the contract; but when such elements are present in such force as to make the discrimination unjust or oppressive the contract will be illegal. It is not necessarily, or *per se*, a legal wrong for a carrier to give better rates to one who ships many car-loads of grain than to one who ships a single car-load, or a single bushel. It is a matter of common knowledge, and, therefore, one of which judicial notice is taken, that an increase in the volume of business is desirable and advantageous; and in the rivalry of business competition it is lawful to favor those whose business is great, rather than those whose business is small, or inconsiderable.

In the case of *Nicholson* v. *Great Western R. W. Co.*, 7 C. B. N. S. 755 (1 Nev. & McN. R. W. Cases, 143), ERLE, C. J., said: "I take the free power of making contracts to be essential for making commercial profit. Railway companies have that power as free as any merchants, subject only (as to this court) to the duty of acting impartially, without respect of persons: and this duty is performed, when the offer of contract is made, to all who wish to adopt it. Large contracts may be beyond the means of small capitalists; contracts for long distances may be beyond the needs of those whose traffic is confined to a home district; but the power of the railway company to contract is not restricted by these considerations."

It is obvious that whether the common carrier acts impartially or not depends upon the circumstances of the particular case, for regard must be had to such circumstances as quantity, distance, and kindred considerations. The hinge

Cleveland, Columbus, Cincinnati and Indianapolis R'y Co. *v.* Closser *et al.*

·of the question is not found in the single fact of discrimination, for discrimination without partiality is inoffensive, and partiality exists only in cases where advantages are equal, and one party is unduly favored at the expense of another who stands upon an equal footing. Many English cases support this general doctrine. *Garton* v. *Bristol, etc., R. W. Co.*, 1 B. & S. 112; *Hozier* v. *Caledonian R. W. Co.*, 1 Nev. & McN. R. W. Cases, 27; *Great Western Railway Co.* v. *Sutton*, 4 L. R. H. L. 226; *Ransome* v. *Eastern, etc., R. W. Co.*, 1 C. B. N. S. 437; *Jones* v. *Eastern, etc., R. W. Co.*, 1 Nev. & McN. R. W. Cases, 45; *Oxlade* v. *North Eastern R. W. Co.*, 1 Nev. & McN. R. W. Cases, 72; *Baxendale* v. *Railway Co.*, 5 C. B. N. S. 336; *Bellsdyke, etc., Co.* v. *North British· R. W Co.*, 2 Nev. & McN. R. W. Cases, 105.

The current of judicial opinion in America flows in the general channel marked out and opened by the courts of England. *Bayles* v. *Kansas, etc., R. W. Co.*, 13 Col. 181; *Spofford* v. *Boston, etc., Railroad*, 128 Mass. 326; *Fitchburg R. R. Co.* v. *Gage*, 12 Gray, 393; *Johnson* v. *Pensacola, etc.,* *R. R. Co.*, 16 Fla. 623 (26 Am. Rep. 731); *Ragan* v. *Aiken*, 9 Lea, 609 (42 Am. Rep. 684); *McDuffee* v. *Portland, etc., R. R.*, 52 N. H. 430 (13 Am. Rep. 72); *Hersh* v. *Northern Central R. W. Co.*, 74 Pa. St. 181; *Christie* v. *Missouri Pacific R. W. Co.*, 94 Mo. 453; *Chicago, etc., R. R. Co.* v. *People, ex rel.*, 67 Ill. 1; *Toledo, etc., R. W. Co.* v. *Elliott*, 76 Ill. 67; *Erie and Pacific Despatch* v. *Cecil*, 112 Ill. 185; *Root* v. *Long Island R. R. Co.*, 114 N. Y. 300; *Kilmer* v. *New York, etc., R. R. Co.*, 100 N.Y. 395; *Stewart* v. *Lehigh, etc., R. R. Co.*, 38 N. J. L. 505; *Union Pacific R. W. Co.* v. *United States*, 117 U. S. 355; *Hays* v. *Pennsylvania Co.*, 12 Fed. Rep. 309; *Interstate Commerce Comm.* v. *Baltimore, ·etc., R. R. Co.*, 8 R. W. & Corp. Law J. 343.

The cases of *State, ex rel.*, v. *Cincinnati, etc., R. W. Co.*, 23 N. E. Rep. 928, *Scofield* v. *Railway Co.*, 43 Ohio St. 571, and *Messenger* v. *Pennsylvania R. R. Co.*, 36 N. J. L. 407,

are not entirely out of line with the decisions to which we have referred, although fragmentary expressions found in some of the opinions seemingly pass the lines of principle. It is very doubtful whether the reasoning in the case of *Burlington, etc., R. W. Co.* v. *Northwestern Fuel Co.*, 31 Fed. Rep. 652, can be regarded as sound, or be made to harmonize with the reasoning in the much more carefully considered case of *Interstate Commerce Comm.* v. *Baltimore, etc., R. R. Co., supra;* but, granting the reasoning to be unimpeachable and the conclusion sound, the decision can not be regarded as of controlling influence in such a case as the one at our bar. In the case upon which we are commenting a recovery was adjudged on the ground that the difference in the rate charged shippers of large quantities of goods and that charged shippers of small quantities was so gross as to be against public policy. We have no such question here. So far as concerns the question of the right to discriminate between shippers, we concur with the general doctrine of the case cited, for we have no doubt that an unjust, unfair or oppressive discrimination is prohibited by the soundest considerations of public policy; but, as we have already suggested, we do not believe that from the sole fact that there is a discrimination a conclusion can be inferred which invalidates the special contract between the carrier and the shipper, for, to warrant such a conclusion, without defying principle, another element must be added to the premises, and that element is this, the discrimination is unjust or oppressive.

In the later case of *Stewart* v. *Lehigh, etc., R. R. Co., supra,* the decision in *Messenger* v. *Pennsylvania R. R. Co., supra,* is explained, and it was said : " The contract held invalid in the Messenger case, above cited, was indeed one enuring to the benefit of the individual and against the corporation, but its terms were such that it could not possibly be effectuated without giving the plaintiff a preference over the public; it was, in effect, that whatever rate should be charged against any one else, twenty per centum less should be

charged to the plaintiff. Plainly, such a contract was not consistent with the company's duty of impartiality. As soon as the general rates were reduced to the standard of the plaintiff's, he was entitled to have his rates reduced twenty per centum lower." It is evident from this that the courts of New Jersey did not hold, nor mean to hold, that a contract giving a special rate, and providing for a drawback, was, in itself, illegal and void. We do not regard the decision in the case of *Indianapolis, etc., R. R. Co.* v. *Ervin,* 27 Am. & Eng. R. R. Cases, 8, as relevant to the point under immediate consideration, and for this conclusion we assign these reasons : The decision is founded upon an express statute, and proceeds upon the assumption that the discrimination was an unjust one. Whether that case does, or does not, overrule the earlier cases decided by the same court we need not inquire, for, however this may be, the reasoning in the earlier cases harmonizes with the doctrine of the standard authorities, and commands our assent. We believe those cases are right in asserting that a preferential rate, although made effective by a provision for a drawback, does not, of its own force, destroy the contract; but, in assenting to the conclusion stated, we do not mean to be understood as asserting that where a preferential rate is given, the fact that a drawback is provided for may not exert an important influence upon the decision of the question whether the discrimination is, or is not, an unjust one ; on the contrary, we mean to do no more than affirm that the single fact will not justify a judicial declaration of illegality. Whether it may be considered in connection with other facts as tending to show an unjust discrimination is a different question from the one before us.

The conclusion that common carriers may, within the limits of fairness and impartiality, consult their own interests, underlies the decisions which we have referred to as correct exponents of the law, and this general conclusion is affirmed in our own case of *Louisville, etc., R. W. Co.* v. *Flanagan,*

113 Ind. 488, and from the doctrine of that case we see no reason for departing. This principle has been given force in many other cases. *Chicago, etc., R. R. Co.* v. *Iowa,* 94 U. S. 155; *Easton* v. *Houston, etc., R. R. Co.,* 32 Fed. Rep. 897; *Glasgow Steamship* v. *Mackinnon,* 27 Am. & Eng. R. R. Cases, 1; *Mogul Steamship Co.* v. *McGregor,* 39 Alb. L. J. 50.

The second paragraph of the complaint alleges that the defendant is, and long has been, a common carrier of goods, and that its custom, of long standing, is to make contracts for carrying grain from Indianapolis to the Eastern cities; that the plaintiffs have long been engaged in the business of buying, selling, and shipping grain; that on the first day of November, 1884, the plaintiffs, under the firm name of Closser & Co., entered into a contract with the defendant whereby it undertook to transport grain from a station on its road, known as Union City, to the city of New York; that at the time this contract was made "there was no open and established rate of freight charges for carrying such grain, except a certain rate agreed upon between the defendant and other railway companies owning competing lines; the rate so fixed by the competing companies was established by an agreement made by them for the purpose of preventing competition," and was enforced and maintained in so far as it was enforced and maintained by an agency of such companies established for that purpose, and called a "pool"; that the "pool" was managed by a person selected by the companies for that purpose, and called a "pool commissioner;" that at the time mentioned all the railway companies that "were so located, or situated, as to be competitors for such freight were parties to said arrangement and "pool;" that the rate established by the combination of common carriers was 21½ cents per hundred weight; that the defendant, "notwithstanding such combination and pool, offered and gave to Closser & Co. an inducement for shipping freight over its line at a rate lower than that fixed by the combina-

tion and 'pool;' but, in order to do this and be able to report to the pool commissioner that such pool rate had been charged," the defendant "requested Closser & Co., when shipping freight over its lines, to pay the pool rate, and agreed at the same time, with Closser & Co., to pay a certain portion of the pool rate so charged, as a rebate, in order that the shippers might, in the end, be only required to pay the rate fixed by the defendant;" that "in this manner and for this purpose the defendant did, on the same day, agree with Closser & Co., in respect to the shipment of grain, that Closser & Co. should pay the pool rate of 21½ cents per hundred weight, and that the defendant would thereupon repay to them 4½ cents on every hundred weight of grain so shipped as a rebate, so that they should, in the end, pay as freight upon such shipment but seventeen cents per hundred weight, which was then, in fact, the rate of the defendant for such freight between said points as then agreed upon, which rebate the defendant agreed to pay promptly after such shipment." It is also alleged that grain was shipped by Closser & Co. under the contract, and that they paid the "pool" rate.

The third paragraph is essentially the same as the second so far as concerns the combination and pool, the agreement for rebate and the like, but it counts upon a contract, similar to that described in the second paragraph, made on the 10th day of November, 1884, and also alleges that the defendant refused to furnish forty-two cars demanded by the appellees and needed by them for the transportation of wheat which they had ready for shipment.

The fourth paragraph of the complaint contains substantially the same allegations respecting the combination and " pool " as those found in the two preceding paragraphs, but it is alleged that on the 30th day of September, 1884, and the 2d day of October of that year, the open and established rate was 12 cents per hundred weight. It is also alleged in this paragraph that Closser & Co. entered into contracts with the defendant on the days named, wherein it was agreed

that it would transport all the grain that they might buy and tender for shipment at that rate, although the combination might increase the rate. It is further alleged that wheat was shipped under the contract, that rates were increased by the combination, that the appellees paid the increased rate, and are entitled under their agreement to a rebate.

The central question presented for our decision is as to the validity of the contract between the rival railroad companies described in the second, third and fourth paragraphs of the complaint, for if that contract was valid it established an open rate, and a shipper would have no right to unite with one of the competing companies to secure, by an undue preference, an advantage over other shippers, or by that means defraud or mislead other carriers who were parties to the agreement creating the " pool." If the combination was a lawful one, then, those who had notice of its existence were bound to refrain from assisting a party to it in defrauding or deceiving other members of the combination for the purpose of securing an advantage for himself over other shippers. If, to descend from a generalization to the particular instance, the combination of the competing carriers was a lawful one, and was known to Closser & Co., and they contracted for a rebate in violation of the terms of the contract which bound the carriers together, and established a rate to which all were under a duty to conform, they can not recover back the sum paid in excess of the rate established by the combined companies. If, however, their agreement was illegal, the courts will turn them away with the answer, that, in substance, at least, has been so often given suitors, " no polluted hand shall touch the pure fountains of justice." One whose road lies through a corrupt contract—a contract which violates the rules of public policy or of commercial honesty—can not recover back money paid under it. The courts will leave the parties where it found them. But if the contract which bound the rival carriers together was illegal, then it was incapable of conveying any right to any person, since a void thing is

as a thing without existence or capacity for existence. If that contract was totally destitute of force, then no person was under an obligation to regard or respect it, for all were bound to know, as matter of law, that it was ineffective for any purpose.

It further follows that if the contract creating the combination was not entitled to respect, there was no obstacle barring the way to a contract between a carrier and a shipper stipulating for a special rate. It still further follows that if the contract between the associated carriers was utterly without force, it is inconceivable that it should obstruct the otherwise unfettered power to make contracts for the transportation of goods where no element of partiality, oppression, or improper favoritism entered into the transaction. Do but grant that the contract between the carriers was void, and it must inevitably follow that it neither obstructs the right to provide by special contract for a special rate, nor makes an act which ignores or disregards the attempt to form such a combination as that described in the complaint wrongful or illegal.

The line of thought we are pursuing naturally leads to the suggestion that where a contract is so corrupted by illegality as to be utterly void, no one of the parties to it, nor any one basing a claim upon it, can successfully assert that a third person who disregards it has committed any wrong or violated any duty, for it seems perfectly clear that no right entitled to respect can arise out of a contract prohibited and condemned by law. It is evident that whatever path be chosen in this instance it leads at last to the pivotal question whether the contract upon which rests the combination formed by the associated carriers possesses any vitality.

We preface our discussion of the central question by saying that we are not, at this point, dealing with a case where a combination is formed for the purpose of preventing ruinous competition, and in which there is no design to stifle fair competition. We are not required to decide, nor do we de-

cide, that combinations fair to the public, untainted by any sinister design, and formed solely to prevent the destruction of business by unregulated competition, may not be valid. There are, we know, cases sanctioning the doctrine that combinations may be formed where the purpose is lawful, and the means employed not forbidden by positive law or high considerations of public policy. *Central Trust, etc., Co.* v. *Ohio Central R. R. Co.*, 23 Am. & Eng. R. R. Cases, 666 ; *Boston Chamber of Commerce* v. *Lake Shore, etc., R. W. Co.*, 32 Am. & Eng. R. R. Cases, 618 ; *Hare* v. *London, etc., R. W. Co.*, 2 J. & H. 80 ; *Leslie* v. *Lorillard*, 110 N. Y. 519 ; *Manchester, etc., R. R. Co.* v. *Concord Railroad*, 8 Ry. & Corp. Law Journal, 443. The doctrine of these cases we neither affirm nor deny ; we do, however, declare that they are not relevant to the matter here in dispute. It is, however, both appropriate and necessary to adjudge that a combination between common carriers to prevent competition is, at least, *prima facie* illegal. The doubt is as to whether any ultimate purpose can save it from the condemnation of the law ; there can be no doubt that, unexplained, such a combination for such a purpose is condemned by public policy. If such a combination can, in any event, be admitted to be legal, it can only be so where it is affirmatively shown that its object was to prevent ruinous competition, and that it does not establish unreasonable rates, unjust discriminations, or oppressive regulations. If such a contract can stand it must be upon an affirmative showing, and one so full, complete, and clear, as to remove the presumption (to which its existence, in itself, gives rise) that it was formed to do mischief to the public by repressing fair competition. The burden is on the carrier to remove the presumption, and until it is removed the agreement providing for the combination gives way before this presumption, and the agreement must be held to be within the condemnation directed against all contracts which violate public policy.

Coming to the question which awaits our judgment, and

Cleveland, Columbus, Cincinnati and Indianapolis R'y Co. *v.* Closser *et al.*

to which we have cleared our path, we affirm that a contract between corporations ·charged with a public duty, such as is that of common carriers, providing for the formation of a combination having no other purpose than that of stifling competition, and providing means to accomplish that object, is illegal. The purpose to break down competition poisons the whole contract, and there is here no antidote which will rescue it from legal death. The element which destroys the contract is the purpose to stifle competition, for a combination of rival carriers, moved and controlled by that purpose alone, is destructive of public interest, and, to the last degree, antagonistic to sound public policy. The principle on which this rule rests is a very old one, and its place in the law is very firm. The overshadowing element in this case, and in kindred cases, is the purpose which influences the parties in uniting themselves in a combination, and concerting means to make its purpose effective, for the law abhors a combination which has for its principal object the suppression of competition in matters of commerce in which the public have an interest. Among the early cases establishing and enforcing the general principle which now occupies our attention are those wherein it is held that an agreement to prevent, or hinder, competition at public sales is void. For illustrations, although there is a vast number of cases, we need not look beyond our own reports. Our court has again and again enforced the general principle we have stated. *Hunter* v. *Pfeiffer,* 108 Ind. 197 ; *Board, etc.,* v. *Verbarg,* 63 Ind. 107 ; *Maguire* v. *Smock,* 42 Ind. 1 ; *Gilbert* v. *Carter,* 10 Ind. 16 ; *Forelander* v. *Hicks,* 6 Ind. 448 ; *Plaster* v. *Burger,* 5 Ind. 232 ; *Bunts* v. *Cole,* 7 Blackf. 265.

" No one," said the court in *Hunter* v. *Pfeiffer, supra,* "can predicate an enforceable right upon such an agreement." In support of this statement the court cited *Atcheson* v. *Mallon,* 43 N. Y. 147 (3 Am. Rep. 678); *Woodworth* v. *Bennett,* 43 N. Y. 273 (3 Am. Rep. 706); *Gibbs* v. *Smith,* 115 Mass. 592 ; *Hannah* v. *Fife,* 27 Mich. 172. Relevant and

striking illustrations of the scope and force of the general principle are supplied by what are known as "The Sugar Trust Cases," decided by the courts of New York—cases rich in argument and authority. *People* v. *North River Sugar Refining Co.*, 22 Abbott N. Cases, 164; see, also, Law Literature of Trust Combinations, etc., 23 Abbott N. Cases, 317; *People* v. *North River Sugar Refining Co.*,121 N. Y. 582. The authorities collected in those cases demonstrate the proposition that a trust, or combination, having for its purpose the suppression of free competition, can not live where the common law prevails. There are, however, cases which, in their facts, bear a closer resemblance to the present than the sugar trust cases; but, after all, it may be said with propriety the important thing to be secured is a sound and salutary general principle, and not merely cases with closely resembling facts. There is no difficulty in securing the principle we seek, for cases almost without number assert and enforce it in an almost endless variety of forms and phases.

One of the cases near akin to the one before us is that of *Hooker* v. *Vandewater*, 4 Denio, 349. In that case competing canal companies combined, and agreed to fix an established rate of freight, and to divide profits. The agreement was adjudged illegal, the court saying, among other things, that "It is a general proposition that an agreement to do an unlawful act can not be supported at law—that no right of action can spring out of an illegal contract; and this rule applies not only when the contract is expressly illegal, but whenever it is opposed to public policy." Still closer is the resemblance between this case and that of *Texas, etc., R. W. Co.* v. *Southern Pacific R. W. Co.*, 41 La. Ann. 970. The court there held a "pooling contract" substantially the same as the one described in the appellees' complaint to be void, and in support of its ruling referred to the cases of *Gibbs* v. *Consolidated Gas Co.*, 130 U. S. 396; *Woodstock Iron Co.* v. *Richmond, etc., Extension Co.*, 129 U. S. 643; *Morris Run Coal Co.* v. *Barclay Coal Co.*, 68 Pa. St. 173; *Arnot* v. *Pitt-*

*son*, etc., *Coal Co.*, 68 N. Y. 558; *Craft* v. *McConoughy*, 79 Ill. 346; *Morrill* v. *Boston*, etc., *Railroad*, 55 N. H. 531; *Jackson* v. *McLean*, 36 Fed. R. 213; *Santa Clara Valley*, etc., *Co.* v. *Hayes*, 18 Pacif. Rep. 391; *Firemen's Charitable Association* v. *Berghaus*, 13 La. Ann. 209; *India Bagging Association* v. *Kock*, 14 La. Ann. 168; *Glasscock* v. *Wells*, 23 La. Ann. 517, and *Cummings* v. *Saux*, 30 La. Ann. 207.

The authorities found on every hand not only fully support our conclusion that a contract between competing carriers, forming a combination for the purpose of stifling competition, is *prima facie* illegal, but many of them carry the principle to a much greater length; it is enough for us, however, that the law, as it has long existed, sustains the conclusion we here affirm, since it is neither necessary nor proper for us to go beyond the case before us for judgment.

Questions respecting rulings upon matters of evidence next require our attention. The first of these questions arises on the ruling sustaining the motion of the appellees requiring the production of books and papers. Counsel for the appellees respond to the argument of their opponents upon this question by asserting, as their primary proposition, that the appellant is not in a situation to avail itself of this ruling, inasmuch as it did not decline to obey the order and suffer the consequences. The counsel for appellees have assumed a position that can not be successfully defended. The appellant was not bound to disregard the order of the trial court, suffer for its disobedience, and then seek redress by appeal; it did all that it was legally bound to do, it objected in due season, in a proper mode, and appropriately reserved an exception. This was sufficient; indeed, the appellant could not have appealed from the isolated order, for cases can not be appealed before final judgment, nor in fragments, except in rare instances, and this case is not a member of that rare class. *Western Union Tel. Co.* v. *Locke*, 107 Ind. 9; *Board*, etc., v. *Fullen*, 118 Ind. 158.

One of the positions taken by the appellees is, however,

impregnable, and defeats the appellant upon the point under direct consideration. It does not appear that irrelevant or improper parts of the books or papers produced in obedience to the order were used, but, so far as the record discloses, the use made of those instruments of evidence was proper, and was made under the supervision of the court. If instruments of evidence are used in the mode required by law, it can not be said that there was prejudicial error, although the motion for their production may have been defective, or the order made upon it too broad. As the court in this instance directed what use should be made of the books and papers, and as there is nothing showing that the direction was not an appropriate one, or that the direction was not fully obeyed, we must, in accordance with the settled rule, presume that there was no irregularity or error in the ultimate action of the trial court. It is incumbent upon an appellant to show an erroneous ruling, and that he was prejudiced by it; failing in this, he can not have a judgment in his favor. *Perkins* v. *Hayward*, 124 Ind. 445.

The question presented upon the ruling admitting the testimony of the witness Closser detailing statements made by Steiner is, perhaps, not entirely free from difficulty, but in view of the character of the testimony, and the evidence tending to make it competent, we have concluded that there was no error in this ruling. It is sufficient to entitle testimony to admission that there is some evidence, direct or circumstantial, tending to make it competent, for it is not necessary that the connecting evidence should distinctly establish the facts which give the character of competency to the testimony, as the court in admitting testimony does not conclusively adjudge that the evidence establishing its competency is sufficient to fully prove the requisite fact or facts; it simply decides that there is some evidence tending to make the testimony competent. *Pedigo* v. *Grimes*, 113 Ind. 148 ; *Shugart* v. *Miles*, 125 Ind. 445.

If, therefore, there was some evidence of such facts as ren-

dered the testimony admissible, there was no error in admitting it, and our opinion is that such evidence was adduced. The evidence shows that Steiner was more than a special agent of the defendant, and that his authority respecting contracts for freight was of wide scope, and it shows, also, that the claim of Closser & Co. for the drawback, or rebate, was presented to Steiner as the representative of the appellant at Indianapolis, and that communications concerning the claim were made to him, and that he conducted the general negotiations by corresponding with the principal and by interviews with Closser & Co. We accept as undoubted law the proposition of the counsel for appellant that the declarations of an agent made after the performance of a special duty delegated to him are not admissible against the principal. *Bellefontaine R. W. Co.* v. *Hunter*, 33 Ind. 335. But, while we fully approve the statement of counsel as to the rule of law, we can not sanction the application made by them of the rule, for the reason that we regard the case as belonging to a class radically different from the one which the rule governs. The case belongs to that class in which corporate agents are intrusted with the transaction of business requiring continuous negotiations, and in which the authority of the agent does not terminate until the negotiations are at an end. The principle which the adjudged cases establish is this : Where authority is delegated to an agent to transact business, and that business requires continuous negotiations, or is a business not fully ended by a single act, but requires a series of acts to complete it according to the intention of the parties and commercial usages, the authority of the agent does not expire with the performance of one act, although that act may be of prime importance. *Pennsylvania Co.* v. *Nations*, 111 Ind. 203 ; *United States, etc., Co.* v. *Rawson*, 106 Ind. 215 ; *Wells* v. *Morrison*, 91 Ind. 51 ; *Louisville, etc., R. W. Co.* v. *Henly*, 88 Ind. 535 ; *Kirkstall, etc., Co.* v. *Furness R. W. Co.*, 9 L. R. Q. B. 468 ; *Morse* v. *Connecticut, etc., R. R. Co.*, 6 Gray, 450 ; *Lane* v. *Boston, etc., R.*

*R. Co.*, 112 Mass. 455 ; *Gott* v. *Dinsmore*, 111 Mass. 45.   Nor is the rule different where the agent is authorized to conduct a single transaction, for, as to that transaction, he is a general agent, invested with authority to perform all acts necessary to fully consummate the transaction.   *Cruzan* v. *Smith*, 41 Ind. 288; *Toledo, etc., R. W. Co.* v. *Owen*, 43 Ind. 405. But, it is proper to say, to avoid possible misconception, the rule does not permit the declarations of an agent narrating a past transaction to be given in evidence.   *Boston, etc., R. R. Co.* v. *Ordway*, 140 Mass. 510.

The facts stated in the special finding are, in most particulars, substantially the same as those stated in the complaint, but there are differences between the facts pleaded and those found by the court, and those differences will be indicated, but not expressly detailed, as we discuss the questions made upon the special finding. ' Many of the questions presented by the special finding are disposed of in the preceding discussion, and we shall not again consider them. .

It was not necessary for the shippers to prove that the rate charged and paid by them, under their contract, was excessive or unjust, for the right to recover rests upon the contract providing for a drawback.   If a common carrier makes a special contract to repay part of the sum received from the shipper he must perform his part of the contract, unless he overthrows the presumption of fairness and right by countervailing facts.

If the contract made by Closser & Co. with the appellant was illegal, then there can be no recovery, and the cases of *Morris* v. *Philpot*, 11 Ind. 447, *Judah* v. *Trustees, etc.*, 16 Ind. 56, *Oscanyon Co.* v. *Arms Co.*, 103 U. S. 261, *Craft* v. *McConoughy*, 22 Am. Rep. 171, *Arnott* v. *Pittson, etc., Coal Co.*, 23 Am. Rep. 190, and *Gregory* v. *Wendell*, '39 Mich. 337, would be of influential importance, but as the contract between the parties was not illegal, a recovery is not defeated, and those cases are not relevant.

It is true, as counsel contend, that a finding beyond the

issues made by the pleadings is ill, and will not support a judgment. *Buchanan* v. *Milligan,* 108 Ind. 433; *Boardman* v. *Griffin,* 52 Ind. 101. If they have established their proposition that the special finding goes outside of the issues, they must succeed, to the extent, at least, that the judgment rests upon facts not within the issues.

Before giving consideration to the precise question argued by counsel, it is proper, and, indeed, necessary, to speak of a matter of procedure, since it is tacitly assumed, although not expressly asserted, that a special finding may be considered in detached parts. This position is not tenable. A pleading does not supply an analogue for guidance in construing and giving effect to a special finding, for a special finding, like a special verdict, a series of instructions, or the like, must be considered as a whole, and it can not be dissected into fragmentary parts and successfully assailed in detail. One part may be considered in connection with other connected parts, or parts referring to the same transaction, and if taken as a whole the finding legitimately supports the judgment it will be upheld.

To determine whether the finding is beyond the issues it was necessary to analyze so much of it as is sought to be impeached, and this we have done with care, but we think it unnecessary to give the result of our analysis in detail. It may be said, generally, that the facts are essentially the same as those pleaded in the complaint, although it is, perhaps, true that the special finding makes a somewhat stronger case than the pleading does, but this does not take the foundation from under the judgment. It is sufficient if the substance of the issue is established, and a finding containing more facts than the plaintiff is required to prove is not ill, provided, of course, the facts are connected with the main issue, support it, and do not establish a distinct and independent cause of action.

It is suggested that a contract, binding a carrier to transport as many car loads of grain as the shipper may desire

transported, is ineffective, for the reason that the shipper is under no obligation to ship any definite or designated quantity of grain. In our judgment the fact that there is no designation of quantity does not invalidate a contract unimpeachable in all other respects. Possibly such a contract may be revoked, but if acts are done in performance, it is, at all events, valid as to those acts, for until there is an effective revocation the contract remains in force. A proposal, although revocable in its nature, becomes effective if accepted and acted upon before annulled by revocation. *Wellington* v. *Apthorp*, 145 Mass. 69; *Louisville, etc., R. W. Co.* v. *Flanagan, supra.*

A question made on the evidence requires a brief consideration. Some of the grain shipped by the appellees was intended for a firm known as Gill & Fisher, with whom it appears the appellant had entered into a contract in which it was agreed that they should be allowed a drawback or rebate on grain consigned to them. On the 25th of September, 1884, after the first contract described in the fourth paragraph of the complaint had been entered into, but before the second contract there described was made, the appellant, by one of its officers, forbade the allowance of drawbacks on grain shipped to Gill & Fisher, and the evidence shows that notice of the interdiction was given to Closser & Co. on the 26th day of the same month. If no more than this appeared we should be inclined to hold that there was a valid revocation and an effective interdiction upon contracts allowing Closser & Co. a drawback on grain consigned to Gill & Fisher, but more does appear, for it appears that a person representing the company—one, too, who had acted for it in making former contracts with Closser & Co.—solicited and obtained the contract entered into on the 2d of October, treated the order referred to as ineffective, and induced Closser & Co. to believe that it had no force. It is probably true that the evidence is not so satisfactory upon the question of the authority of the agent who represented the

appellant in making the contract of October 2d, or as to whether the interdiction was abrogated or withdrawn, as might be desired, but there is evidence tending to prove that an agent superior to the one who gave the order forbidding drawbacks on grain shipped to Gill & Fisher, authorized the contracts to be made, and that all agents of the company concerned in the transactions declared that the interdiction was withdrawn, and treated it as devoid of force. In this state of the evidence we must, in obedience to a long settled rule, decline to disturb the decision of the trial court upon the controverted question of fact.

A cross-error assigned by the appellees challenges the correctness of the conclusion of law which denies a full recovery upon the cause of action stated in the third paragraph of the complaint, and we have carefully studied the finding upon that branch of the case. The result of our examination is that the facts stated are not so full and clear as to authorize us, as in favor of a party having the burden of proof, to overthrow the conclusion of law stated by the trial court, although the question is a very close one, and our conclusion upon it is reached with some hesitation.

Judgment affirmed.

Filed Dec. 17, 1890.