## Mount *v.* Board of Commissioners of the County of Montgomery.

[No. 20,721. Filed March 20, 1907. Rehearing denied June 25, 1907.]

1. Trial. — *Special Findings.* — *Primary and Ultimate Facts.* — Where the primary facts in a special finding all point to but one conclusion, a statement of the ultimate facts is not necessary. p. 665.

2. Same.—*Special Findings.—Evidentiary Facts.—Consideration of.*—Evidentiary facts embodied in a special finding may be considered so far as they explain or give color to the facts found. p. 665.

3. Words and Phrases.—*"Understood."—"Agreed."*—The words "understood" and "agreed" may be used synonymously as showing a contract relation. p. 666.

4. Trial.—*Special Findings.—Contracts.*—A special finding showing that plaintiff told a third party that if such party would execute certain affidavits plaintiff "would treat him right," and that "thereupon" he executed such affidavits, and that "in pursuance of this agreement" he assisted plaintiff in such prosecu-

tions and that plaintiff paid such party a sum "in full settle-ment" of such transaction, shows that a contract was entered into.  p. 666.

5.  TRIAL.—*Special Findings.—How Considered.—Intendments.*—Special findings should be considered as a whole, all reasonable presumptions and intendments being in their favor.  p. 666.

6.  SAME. — *Variance.—How Questioned.—Appeal.—Contracts.*—Where an answer avers that plaintiff and two other parties entered into a contract, and the special findings show that he entered into such contract with but one of such parties, there is a variance only and not a failure of proof, and the question of such variance, to be available on appeal, must be raised in the trial court.  p. 667.

7.  ELECTIONS. — *Buying Votes. — Rewards. — Statutes.—Public Policy.*—It is contrary to public policy for a party, who has assisted in bribing a voter, to recover the reward provided by §2330 Burns 1901, Acts 1899, p. 381, §2, for procuring the con-viction of such voter.  p. 667.

8.  SAME.—*Bribing Voters.—Rewards.—Division of.—Public Pol-icy.*—Where a party assists in the bribery of voters, and is therefore unable to collect the reward provided by §2330 Burns 1901, Acts 1899, p. 381, §2, for procuring the conviction of a voter, he cannot transfer his rights to another so as to give a right of recovery; and such other party cannot recover, since the court cannot make an apportionment of the legal from the illegal.  p. 668.

9.  PUBLIC POLICY.—*Rights Gained by Contract to Pay for Im-moral Conduct.*—It is contrary to public policy to permit a plaintiff to recover, where his asserted right of action rests upon a contract to reward a third party for his iniquity.  p. 668.

10.  ELECTIONS.—*Bribing Voters.—Suppression.—Statutes.—Re-wards.*—The act of 1899 (Acts 1899, p. 381, §§2329, 2330 Burns 1901), providing for the conviction of bribed voters and giving a reward to the person securing the conviction, was designed to suppress the crime of vote selling.  p. 669.

From Fountain Circuit Court; *John S. Lairy*, Special Judge.

Action by Finley P. Mount against the Board of Com-missioners of the County of Montgomery.   From a judg-ment for defendant, plaintiff appeals.  *Affirmed.*

*S. C. Kennedy,* for appellant.

*Irvin C. Dwiggins, R. H. Williams* and *W. T. Whittington,* for appellee.

GILLETT, J.—Appellant sought by this action to recover $3,600 from the county of Montgomery. His demand was based on the claim that he had furnished the testimony necessary to secure, and had thereby secured, the conviction of thirty-six persons, charged with vote selling. On issues joined, there was a trial by the court, and, pursuant to a request for a special finding, the court found the facts specially, and stated as its conclusion that the law was with the defendant. Appellant assigns as error that the court erred in its conclusion of law.

The findings are quite long, and, except as they have to do with the contentions on appeal, we shall only attempt to exhibit them in outline. It appears that during the political campaign of 1900 two persons, Thompson and Benjamin by name, corrupted thirty-six voters of said county, thereby rendering them liable to the penalties prescribed by section one of the act of March 1, 1899 (Acts 1899, p. 381, §2329 Burns 1901). On or about November 30, 1900, Thompson and Benjamin counseled with appellant, who was an attorney at law, for the purpose of ascertaining whether they had violated any federal statute. Thompson held the receipts of said voters, and, during the course of said conversation, a plan was discussed, to the ultimate effect that appellant should seek to recover the statutory rewards, and that there should be a division between the three of such moneys as might be obtained on account of the conviction of said voters. A part of the plan outlined was that appellant should seek to induce certain members of another political party to prosecute certain of its voters, but, as the efforts in this direction failed, Thompson declined to have anything further to do with the matter, and also refused to turn over the receipts. Within a day or two afterwards, appellant prepared the form of a written

contract, to be executed by the three, which provided that Thompson and Benjamin should prosecute said voters, that the receipts aforesaid be turned over to appellant, and that whatever rewards should be obtained for the conviction of said voters should be divided equally among the three. Appellant and Benjamin signed this contract, but Thompson refused to sign, and the entire matter of the prosecution of said voters was dropped. A few days later appellant called upon Benjamin, and sought to get him to furnish the names of said voters and to make the necessary affidavits, so that appellant might commence said prosecutions. Benjamin refused to do this, and appellant then made an unsuccessful effort to procure such names from Thompson. Benjamin afterwards came to the office of appellant, and gave him the names of said voters, and appellant prepared forms of affidavits and information against them for the violation of said statute. On November 15, 1900, Benjamin again called at the office of appellant, and the latter at that time demanded of Benjamin that he sign the affidavits, but he left the office without doing so. At this point we quote from finding three as follows: "That afterwards, and on the same day at 5:30 o'clock p. m., said Benjamin came to the office of said plaintiff, in answer to a telephone call from said plaintiff, and, upon reaching the office, said plaintiff demanded of said Benjamin, in strong and forceful language, that he sign and swear to the affidavits hereinbefore mentioned; that said plaintiff at said time said to Benjamin that, if he would sign said affidavits and come into court willingly and give his testimony in the cases against said persons so charged in said affidavits with selling or offering to sell their votes, he [plaintiff] 'would treat him [Benjamin] right about the matter;' that thereupon said Benjamin signed and swore to the affidavits; * * * that it was understood between said Benjamin and said Mount before the commencement of said prosecutions that what-

ever rewards were recovered from the prosecution and conviction of said voters of Montgomery county, for selling or offering to sell their votes at said election held November 6, 1900, should be shared and divided between them, no amount of division being fixed; that, in pursuance of this agreement, Benjamin signed and swore to the affidavits upon which said prosecutions were based, and also gave his testimony in said prosecutions, and afterwards, in September or October, 1901, said Benjamin was paid $100 by Mount, in full settlement of his share of the rewards which might be recovered on account of said prosecutions." It is further found that upon the evidence furnished by Thompson and Benjamin appellant prosecuted, and, at the January term, 1901, of the Montgomery Circuit Court, secured the conviction of said voters.

It is contended on behalf of appellant that for the most part the findings fail to set forth the ultimate facts on which the defense is predicated. It is, however, 1. to be recollected that where the primary facts lead to but one conclusion, there is no occasion for a statement of the ultimate fact. *Smith* v. *Wells Mfg. Co.* (1897), 148 Ind. 333. And see *Smith* v. *Wabash R. Co.* (1895), 141 Ind. 92. Some of the preliminary findings, while evidentiary in their character, tend to explain or give color to finding three, and to that extent 2. are to be regarded. It appears from these preliminary findings that appellant was active in putting on foot the arrangement to secure the rewards, that he importuned Benjamin to furnish him the names of the voters, and that in strong and forceful language he demanded of Benjamin that he sign and swear to the affidavits. In the conversation which preceded the commencement of the prosecutions, appellant said to Benjamin that if he would make the affidavits and come into court willingly and give his testimony in the cases, he (appellant) "would treat him [Benjamin] right," and "thereupon," the

finding proceeds, "Benjamin signed and swore to the affidavits." It may be that in the subsequent finding, as to what was "understood" between Benjamin and appellant, the court did not express itself as accurately as if it had found that the matter was agreed to by them, but the words "understood" and "agreed" may be used synonymously. *Higginson* v. *Weld* (1859), 14 Gray 165; *Barkow* v. *Sanger* (1879), 47 Wis. 500, 3 N. W. 16; *Bullock* v. *Johnson* (1900), 110 Ga. 486, 35 S. E. 703; *Saltmarsh* v. *Bower & Co.* (1859), 34 Ala. 613; *Griffin* v. *Isbell* (1850), 17 Ala. 184; *Winslow* v. *Dakota Lumber Co.* (1884), 32 Minn. 238, 20 N. W. 145; 8 Words and Phrases, p. 7162, title, Understanding. It will be observed that a little farther on the court refers to what was done "in pursuance of this agreement," thus showing the sense in which the court used the word "understood," and when to this is added the light that the negotiation throws upon the subject, and it is further considered that the court found that appellant afterwards paid Benjamin $100 "in full settlement of his share of the rewards which might be recovered on account of said transactions," there is no difficulty in reaching the conclusion that there was an agreement between them for the sharing of the rewards. In ascribing meaning and effect to a special finding, it is to be read as a whole; the intendments are in its favor, rather than against it, and if, by considering one part in connection with other parts relative to the same matter, the finding can be said to be sufficient, it will be upheld. *Cleveland, etc., R. Co.* v. *Closser* (1890), 126 Ind. 348, 9 L. R. A. 754, 22 Am. St. 593; *Kedey* v. *Petty* (1899), 153 Ind. 179. We do not regard ourselves as at liberty to segregate the finding as to what was understood from the other findings, and when so read the intent of the court is in nowise uncertain.

Appellant's counsel further insist that since the answer charges that a contract was entered into between appellant,

Benjamin and Thompson, a finding that the con-
6.  tract was entered into between appellant and Ben-
jamin is without the issues, and should therefore be
disregarded.   It is to be borne in mind, however, that the
question is not presented as it would be if the parties as-
serting the contract were relying on it as a basis of a cause
of action, but the fact as to the contract is simply pleaded
to link appellant with an unlawful transaction.   In these
circumstances we are of opinion that, as between the alle-
gation and proof of the facts as found, it cannot be said
that there is a failure of proof, but rather that there is a
variance; in other words, in respect to that which makes
the matter significant, the allegation does not stand as un-
proved in respect to its general meaning, but it is merely
not proved precisely as laid.   This we regard as a mere
variance (*Glasgow* v. *Hobbs* [1875], 52 Ind. 239; *Miller*
v. *Kendig* [1880], 55 Iowa 174, 7 N. W. 500; *McMahan*
v. *Miller* [1880], 82 N. C. 317), and, in the absence of any
objection made below, the point is not available here.
*Latshaw* v. *State, ex rel.* (1901), 156 Ind. 194; *Hartwell*
*Bros* v. *Peck & Co.* (1904), 163 Ind. 357; *M. S. Huey*
*Co.* v. *Johnston* (1905), 164 Ind. 489.   Having disposed
of the objections to the finding, we proceed to the main
question.

It was held in *Board, etc.,* v. *Davis* (1904), 162 Ind.
60, that as one who buys a vote commits a wrongful
and immoral act, public policy forbids that he
7.  should recover the reward provided for by section
two of the act mentioned.   To that extent, there-
fore, the general language of the statute was restrained.
No question is made concerning the correctness of that de-
cision, but it is contended on behalf of appellant that he
should not be regarded as within the principle of said
holding by reason of his connection with Benjamin.

Because of the concert of action on the part of appellant
and Benjamin, it is clear that the latter, but for his subse-

quent agreement with appellant, and his disability as the vote buyer, would have been entitled to share in the rewards. 24 Am. and Eng. Ency. Law (2d ed.), 959, and cases cited. The contract between them, it will be observed, did not definitely fix the share of Benjamin. If their relations to the undertaking had remained as they were when the prosecutions were commenced, it would appear that their interests in the rewards were absolutely interlocked. In view of this, we are unable to perceive how appellant's case has been helped by his subsequent settlement with Benjamin. The right, if any, to the rewards became fixed at that time, since the convictions had then been obtained, and as both had performed under the contract, their rights, as between each other, were measured by it, and not otherwise. As to Benjamin's share, appellant cannot recover it as an assignee, and as to his own share, he has no standing to require the amount to be determined, for that would be calling on the court to make an apportionment based on the terms of what we can but regard as an unlawful contract. "The rule of law," said Parker, C. J., in *Russell* v. *De Grand* (1818), 15 Mass. 35, 39, "is of universal operation, that none shall, by the aid of a court of justice, obtain the fruits of an unlawful bargain." See, also, *Gibbs* v. *Consolidated Gas Co.* (1889), 130 U. S. 396, 9 Sup. Ct. 553, 32 L. Ed. 979; *Davis & Co.* v. *Gemmell* (1891), 73 Md. 530, 21 Atl. 712.

It appears to us that it would be contrary to public policy to give a party a remedy who has become possessed of his asserted cause of action by reason of his compact with another to reward him for his iniquity. The *delictum* rule finds its ordinary application in cases in which one of the parties to an illegal contract is seeking to enforce it against the other, but as the rule is not for the benefit of the defendant, but was established on the ground of public policy, it follows that a plaintiff may find himself within the principle of the rule, although he is not

seeking to enforce a contract, the fact being that he is so yoked up with a wrongdoer that to grant him a remedy would be to contravene the public policy of the State. Perhaps the nearest analogy to the case in hand is presented by champertous agreements, not such as are merely collateral to the suit, but involving those cases in which the champertor brings the action. It is, of course, unnecessary that we should consider the extent that the doctrine concerning champerty has, with changing views of public policy, been overlaid with distinctions. The point we make is that, antedating all enactments on the subject, champertous agreements were by the common law held void, since they were regarded as pregnant with great mischief to the public. *Scobey* v. *Ross* (1859), 13 Ind. 117; *West* v. *Raymond* (1863), 21 Ind. 305; 6 Cyc. Law and Proc., 853.

The purpose in enacting a statute which provides for the payment of a reward out of the public treasury for the production of testimony which leads to the conviction of a lawbreaker, must be presumed to be to suppress, and not to encourage, crime. The title of the act in question shows that it is "an act to procure the purity of general, special and primary elections." It would be a shame and a scandal to construe such a statute as requiring the payment of the reward to one who, morally speaking at least, was an accomplice in the violation of the law. Not only should he have no cause of action which is grounded in his own wrong, but he should be placed beyond the temptation of being able to buy votes, and then, by means of a compact with another, to make his iniquity a matter of profit to himself. In other words, it should be understood as to him that his immorality "is not a vendible article in our system of laws and morals." *Oscanyan* v. *Arms Co.* (1880), 103 U. S. 261, 273, 26 L. Ed. 539. To hold otherwise would be to afford an indirect incentive to the doing of the very acts of evil which the lawmaking

power was seeking to suppress. Even if the intent of the corruptionist to make merchandise of his wickedness may in some cases be formed afterwards, yet it is to be assumed that such a person has no profound sense of the virtue of truth speaking, and the county—a wholly innocent party— would be subject to imposition, since the evidence of intent would be wholly within the control of the former. And further, to view the matter practically, since he alone may make available his information, and can dictate the terms on which he will give it to another, he really stands in the attitude of an assignor respecting what he has to dispose of, and the spectacle is presented, if a recovery is permitted, of the compulsion of the county to underwrite contracts in favor of its vote buyers, since it is required by statute to extend the offer of the reward to minimize vote selling. Moreover, it appears to us that if appellant could have any right to the rewards, apart from the contract, it would be in the nature of a new right, on account of services performed after the agreement, but as this conclusion would practically involve the proposition that the furnishing of the information by the corruptionist could, as between the parties, in all cases be made the subject of a trafficking in the ill-gotten knowledge, principle requires the holding, to prevent the vote buyer from indirectly mulcting the county on account of his own wrong, that the vendee should be regarded as standing in the shoes of the person with whom he has thus linked himself.

The service which appellant rendered in bringing to justice these thirty-six voters, who were so lost to decency as to make merchandise of their citizenship, was a valuable service, but the fact remains that it would be contravening public policy to give a vendible quality to the iniquity of vote buying. The case, therefore, appears to be within the principle of *Board, etc.,* v. *Davis, supra,* and, although, between the corruptionist and appellant, the conviction of the

vote sellers has been obtained, we have only to observe, to borrow somewhat from the thought of *Trist* v. *Child* (1874), 21 Wall. 441, 452, 22 L. Ed. 623, that "the whole is a unit and indivisible. That which is bad destroys that which is good, and they perish together."

Judgment affirmed.