**DIAMOND INTERNATIONAL CORPO-
RATION, Plaintiff, Appellant,**

v.

**ALLSTATE INSURANCE COMPANY, et
al., Defendants, Appellees.**

No. 83–1061.

United States Court of Appeals,
First Circuit.

Argued May 2, 1983.

Decided July 25, 1983.

Wayne C. Beyer, Manchester, N.H., with whom John A. Graf, Bradford W. Kuster, and McLane, Graf, Raulerson & Middleton Professional Ass'n, Manchester, N.H., were on brief, for plaintiff, appellant.

William S. Orcutt, Manchester, N.H., with whom Wiggin & Nourie, Manchester, N.H., was on brief, for defendants, appellees.

Before COFFIN and BREYER, Circuit Judges, and RE,* Judge.

COFFIN, Circuit Judge.

Diamond International Corporation (Diamond) seeks a declaratory judgment in this diversity action that certain management personnel of a wholly owned subsidiary, Groveton Papers Company (Groveton), are covered by a comprehensive general liability policy, issued by Allstate Insurance Company (Allstate), in connection with an industrial accident involving another Groveton employee. The district court for the District of New Hampshire denied coverage.

I. Background

The accident underlying this action took place on March 7, 1978, when Groveton employee Brandon Morehouse suffered seri-

* Of the United States Court of International Trade, sitting by designation.

ous injuries to his right arm and hand while operating a paper rewinding machine in the company's Groveton, N.H., plant. Claiming breach of duty to maintain a safe workplace [1], Morehouse sued a number of Groveton executives and co-employees and was joined in each suit by his wife, who seeks compensation for loss of consortium.[2] Among these defendants are the two management personnel whose coverage is denied by Allstate here: Clarke Harding, assistant paper machine superintendent at the time of Morehouse's accident, and Walter MacDonald, then vice president in charge of manufacturing.[3]

Two basic questions are presented: whether Harding and MacDonald are covered for bodily injury to Morehouse, and whether they are covered against Cathy Morehouse for loss of consortium. We address each issue in turn, but first examine the district court's choice of law.

II. Choice of Law

■ Allstate argues that New York law governs the construction of its policy because the policy was issued in New York to Diamond's New York headquarters, and was signed by Allstate's New York registered agent. Diamond contends that the policy is to be construed according to the law of New Hampshire as the state which is the principal location of the insured risk— i.e., the site of the Groveton plant where Morehouse was injured. The policy itself is silent on choice of law. Since suit in this diversity case was brought in New Hampshire, New Hampshire choice-of-law rules control. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1940).

The district court issued two opinions on the question. In its first opinion, the court

relied on two New Hampshire cases applying the traditional *lex loci contractu* rule to conclude that "the rights and obligations of parties under a liability insurance policy issued in a foreign jurisdiction are governed by the law of that jurisdiction." *See Maryland Casualty Co. v. Coman,* 106 N.H. 364, 212 A.2d 703 (1965); *Cohen v. John Hancock Mutual Life Insurance Co.,* 98 N.H. 341, 101 A.2d 270 (1953). Since the policy was issued by "Allstate, by one of its New York registered agents, ... in New York State ... to Diamond, a New York headquartered corporation", the court concluded that New York law governed the construction of the policy.

On reconsideration, the court softened its reliance somewhat on the *lex loci contractu* rule, but again concluded that New York law governed, on the theories that the policy "was not ... written with the intention that New Hampshire law should control", that "the circumstances of the application, the issuance and the execution of th[e] policy ... reflected an intention that New York law apply", and that even under more recent choice-of-law tests, New York law should apply because "New York has the most substantial interest in contracts executed there".

We begin our review by noting that the precedents are not wholly clear. Older New Hampshire cases follow the *lex loci contractu* rule and apply the law of the place of making in interpreting contracts. Then, in the mid-1960's, the New Hampshire Supreme Court began to question the old choice-of-law rules. *See Clark v. Clark,* 107 N.H. 351, 222 A.2d 205 (1966); *Thompson v. Thompson,* 105 N.H. 86, 193 A.2d 439 (1963). In 1968, in *Consolidated Mutual Insurance Co. v. Radio Foods, Corp.,* 108

1. Subsequent to Morehouse's accident, New Hampshire abolished the safe workplace action against co-employees. *See* N.H.Rev.Stat.Ann. § 281:12, amended June 27, 1978, by 1978 N.H. Laws ch. 46:1.

2. Morehouse has since died in an unrelated motorcycle accident. The suits in question here are now captioned *Cathy Morehouse, Individually and as Executrix of the Estate of Bran-*

*don J. Morehouse v. Clarke Harding,* C–81–359–L, and v. *Walter MacDonald,* C–81–364–L. Both were brought in the district court in New Hampshire on the basis of diversity of citizenship.

3. Neither is presently with Groveton: MacDonald has retired, and Harding has taken other employment.

N.H. 494, 496–97, 240 A.2d 47, 48–49 (1968), the New Hampshire court abandoned the *lex loci contractu* rule and adopted the approach of the Restatement (Second) of Conflicts, under which contracts are governed both as to validity and performance by the law of the state with the most significant relationship to the matter in issue. *Id.* at 496, 240 A.2d at 49, *citing* Restatement (Second), Conflict of Laws §§ 332, 332a, 332b (Tent. Draft No. 6) (1960).

The most significant relationship in insurance cases—" 'the contact that is given the greatest weight' ", *id.* at 497, 240 A.2d at 49, *citing* Restatement (Second) § 346i comment a (Tent. Draft No. 6)—is " '[t]he principal location of the insured risk' ".[4] *Id.* With respect to multiple risk policies, such as the one in issue here, the court held that "the New Hampshire risk insured is to be treated as though it were insured by a separate policy and the validity of and rights under the multiple risk policy as to this risk are to be governed by the laws of this State." *Id., citing* Restatement (Second) § 346i comment f (Tent. Draft No. 6).

Despite *Radio Foods,* the place of contracting has not been abandoned altogether and it remains a relevant, though subsidiary, consideration in insurance cases even under the Restatement (Second). *See* Restatement (Second), Conflict of Laws § 188(2) (1971) (final version). More importantly here, the New Hampshire Supreme Court itself continues to cite old cases relying on the *lex loci contractu* rule. In *Vigneault v. Travelers Insurance Co.,* 118 N.H. 75, 78, 382 A.2d 910, 912–13 (1978), the court relied on *Maryland Casualty Co. v. Coman, supra,* a 1965 *lex loci contractu* case, to hold that Massachusetts law governed an automobile insurance policy issued

in Massachusetts to a Massachusetts driver. In *Greemore v. American Home Assurance Co.,* 113 N.H. 250, 252, 305 A.2d 681, 682 (1973), the court relied on *Coman* to apply Massachusetts law to an insurance policy bought in Massachusetts by a Massachusetts corporation. In both cases, the underlying accidents took place not in Massachusetts, but in New Hampshire. Other cases are to similar effect. *See also Travelers Indemnity Co. v. Stearns,* 116 N.H. 285, 286, 358 A.2d 402, 403 (1976) (policy issued in Massachusetts to Massachusetts resident; accident in New Hampshire; Massachusetts law applied to construction of policy); *Allstate Insurance Co. v. O'Shaughnessy,* 118 N.H. 66, 69, 384 A.2d 486, 487 (1978) (policy issued in Maine; accident in New Hampshire; Maine law applied to policy).

We do not, however, read these cases as a retreat from the Restatement (Second) or as a silent repudiation of *Radio Foods.* The law of the place of contracting in these cases was also the law of the state which was the *principal* location of the insured risk during the policy term. That the accidents took place in New Hampshire was irrelevant, because New Hampshire was not the *principal* location of the insured risk. The *principal* risk was elsewhere—in *Vigneault, Stearns* and *O'Shaughnessy,* Massachusetts or Maine, where the insured automobiles were garaged and/or registered; in *Greemore,* Massachusetts, where the flight service was located and where the flight in question originated.[5]

██  At most, these post-*Radio Foods* decisions indicate that traditional and modern choice-of-law rules will often generate the same result, and that either may be used in such a case. The New Hampshire court

---

**4.** The final version of the Restatement (Second) is to the same effect and reads as follows:
"The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the *principal location of the insured risk during the term of the policy,* unless with respect to the particular issue, some other state has a more significant relationship ...

to the transaction and the parties, in which event the local law of the other state will be applied." Restatement (Second), Conflict of Laws § 193 (1971) (emphasis added).

**5.** Far from repudiating the Restatement (Second), *Stearns* goes so far as to cite it. *See Stearns, supra,* 116 N.H. at 286, 358 A.2d at 403, *citing* Restatement (Second) § 193 comment c.

itself recognized the likelihood of such an overlap in *Clark v. Clark, supra,* when it observed that "[m]ost of the choice of law rules *and results* that have been reached in the past were supported by good sense and sound practical analysis, and will not be affected by reexamination in terms of the relevant choice-influencing considerations." 107 N.H. at 357, 222 A.2d at 210 (emphasis added). Where the traditional and modern rules do not generate the same result, however, we are persuaded that the New Hampshire courts would apply the modern approach. We therefore conclude that the district court erred in applying the *lex loci contractu* rule, and in concluding that the state of issuance has the most significant relationship to an insurance policy under modern choice-of-law tests.

We are also persuaded that the district court placed undue emphasis on the place of contracting when it concluded that the parties "intended" New York law to apply. We are of course bound by the district court's findings of fact unless they are clearly erroneous. Thus, we do not question its findings on the circumstances surrounding the application, issuance and execution of the policy (i.e., that the policy was issued in New York, that Diamond is headquartered in New York, that the policy was signed by Allstate's New York registered agent). The *interpretation* of those circumstances, however, as they bear on the intent expressed in the policy is a question of law for our independent review. *See Murphy v. Doll-Mar, Inc.,* 120 N.H. 610, 611, 419 A.2d 1106, 1108 (1980) (interpretation of a written instrument is as a general rule an issue of law for the reviewing court to determine).[6]

Whatever the parties' unexpressed intention, we cannot say on the facts found

by the district court that they expressed any choice of law in the insurance policy, either explicitly or by implication. The policy contains no choice-of-law provision, and no references to New York legal doctrines or theories that would justify an inference that New York law was intended. *See* Restatement (Second) § 187 comment a. Though headquartered in New York, Diamond does business in a number of states, and the policy expressly extends coverage to Diamond subsidiaries. Among these subsidiaries is Groveton, located in New Hampshire. In view of the non-New York contacts implicit in the policy, we cannot say that the issuance of the policy in New York to Diamond's headquarters amounts to a choice of New York law by the parties, or to anything more than an accident of corporate procedure or convenience.

At any rate, we cannot say that these circumstances amount to a *"clearly* expressed intention . . . as to what law was to govern"; absent a clear expression, judicial choice-of-law rules—here, the rules of *Radio Foods* and the Restatement (Second)—control. *See Radio Foods, supra,* 108 N.H. at 496, 240 A.2d at 48 *and authorities cited thereat.*[7]

Applying these rules to the instant case, it is clear that the Allstate policy is a multiple risk policy, and that the principal location of risk with respect to Diamond's Groveton subsidiary is New Hampshire. We are therefore persuaded that a New Hampshire court would apply New Hampshire's law in construing the policy.

### III. Coverage of Harding and MacDonald for Bodily Injury to Morehouse

The policy extends general comprehensive liability coverage to Diamond and

---

6. This principle is equally applicable to the determination of implied intent on choice of law issues. *Cf. Goulet v. Goulet,* 105 N.H. 51, 192 A.2d 626 (1963); *Davis v. Aetna Mutual Fire Insurance Co.,* 67 N.H. 218, 34 A. 464 (1892). Although the court in these cases did not recite the principle, it is evident from the decisions that the court put its own independent interpretation of intent on the factual circumstances found by the trial courts.

7. To hold otherwise on this record—to hold that the parties intended the law of the state of issuance to govern—seems to us to resurrect the *lex loci contractu* rule. This we may not do. Although *Radio Foods* emphasizes the primacy of the parties' intent, 108 N.H. at 496–97, 240 A.2d at 49, the decision also recognizes that the place of contracting is an unreliable index of that intent. *Id.*

Groveton as "named insureds" and, as additional "insureds", to "any executive officer, director or stockholder thereof while acting within the scope of his duties as such". Excluded from coverage, in relevant part, are injuries "for which the Insured . . . may be held liable under any workmen's compensation, unemployment compensation or disability benefits law" and "bodily injur[ies] to any employee of the Insured arising out of and in the course of his employment by the Insured". Allstate denies coverage on two grounds, claiming that MacDonald and Harding were not "executive officers" within the meaning of the policy, and that Morehouse's injuries are in any event excluded from coverage.[8]

### A. "Executive Officers"

Allstate does not address the New Hampshire definition of "executive officers" in its brief, arguing only that MacDonald and Harding were not executive officers under New York decisions, because they did not have "[t]he power to guide or control the policies or purposes of the corporation [Diamond] or to represent it in a proprietary sense". *Small v. Gibbs,* 222 App.Div. 699, 225 N.Y.S. 141, 141–42 (App.Div.1927). *See also Steiner v. Pleasantville Constructors, Inc.,* 181 Misc. 798, 46 N.Y.S.2d 120, 123 (N.Y.City Ct.1943).

■ Whatever the case under New York law, the New Hampshire Supreme Court has indicated that the term executive officer is ambiguous in the absence of a precise definition in the policy, and must therefore be construed against the insurer. *Young v. New Hampshire Indemnity Co.,* 120 N.H. 882, 884, 424 A.2d 205, 206 (1980). In *Young,* the New Hampshire court distinguished between "corporate officers" and "executive officers" and indicated that an

"executive" officer was any officer holding a position of administrative or managerial responsibility in a business organization. *Id.* at 883, 424 A.2d at 206. Applying this definition, the court concluded that a plant manager of a manufacturing plant was an "executive officer" under a provision virtually identical to the one at issue here. In reaching this result, the court noted a number of factors. First, the plant involved many large, complex machines. Second, the plant manager was responsible for supervising three foremen and forty employees and for compliance with federal environmental and occupational health and safety regulations. Third, the plant manager was involved in the purchase and construction of other plants. Fourth, he had in the past bound the corporation to contracts with machinery contractors and other tradesmen on his own signature. In addition, the company treasurer, who purchased the policy, had given his opinion that an executive officer was an officer with authority "to hire, fire, get things done in his department". Finally, both the treasurer and president had testified that they thought the plant manager was covered by the policy.

■ Applying *Young* to the instant case, it is evident that MacDonald was an "executive officer" under the Allstate policy. He was a vice president of the company, in charge of manufacturing at the time of Morehouse's accident, and was responsible for the entire mill, its engineering functions, and all of its approximately 650 employees. He oversaw other supervisory personnel, including the safety director, the paper machine superintendent, the plant engineer, and the finishing room superintendent.

8. Diamond also claims coverage under an endorsement which extends coverage to "any employee of the Named Insured [i.e., any employee of Diamond or its subsidiaries such as Groveton] while acting within the scope of his duties as such". This argument need not detain us long. Although MacDonald and Harding were undoubtedly employees of a named insured (Groveton), the endorsement specifically excludes damages on account of "bodily injury to . . . another employee of the Named Insured arising out of or in the course of his employment". Whether or not Harding and MacDonald are covered *as executive officers* in the Morehouse suits, their coverage *as employees* does not reach the Morehouse claims, because Morehouse was "another employee of [a] Named Insured [Groveton]", and the claims arose out of his employment with Groveton.

■ With regard to Harding, the picture is less clear. Like the plant manager in *Young*, Harding had certain supervisory responsibilities. He supervised seven tour bosses, who in turn supervised the paper machine crews; in all, a total of some 90 to 100 employees reported directly to him. He was a salaried employee. He had research, development, and purchasing responsibility, and power to hire and fire employees. He had an office, a telephone, and secretarial help, though not a secretary of his own. On the other hand, he evidently did not have the sort of plant-wide responsibilities of the manager in *Young*, nor responsibility for dealing with government regulators.

Since the district court denied coverage on other grounds on the basis of New York law, it left the question of Harding's status unresolved. Rather than resolve Harding's status ourselves, we are persuaded that the better course is to remand the question to the district court. As *Young* indicates, the status determination is fact-sensitive, particularly here, where the question may be close. On remand, the district court is free to develop additional facts. We note only that doubts should be resolved in favor of coverage, in keeping with *Young*.

### B. Effect of the Employee and Workmen's Compensation Exclusions

The exclusion in question excludes bodily injury to employees "of the Insured". Allstate and the district court read this language to mean employees "of Groveton" so as to exclude suits for bodily injury by co-employees. We disagree.

■ Although the policy defines "insured" to mean "*any* person or organization qualifying as Insured in the 'Persons Insured' provision" (emphasis added), the definitions section also provides that "[t]he insurance afforded applies *separately* to each Insured against whom claim is made or suit is brought" (emphasis added). We must therefore read the policy and exclusions as if Harding and MacDonald each had a policy of his own, substituting their names for the term "Insured". Reading the policy in this way, it is evident that the exclusion is ineffective to exclude coverage here, for Morehouse was an employee of Groveton, but he was not an employee of either Harding or MacDonald. Since the policy only excludes bodily injury to employees "of the Insured" (i.e., employees of Harding and MacDonald, the particular insureds against whom the Morehouse claims were brought), the exclusion is inapplicable.

■ If the result seems anomalous, the short answer is that Allstate could easily have limited coverage more narrowly by excluding bodily injury to employees of "named" insureds from the coverage of executive officers, just as it did in the employee endorsement with respect to their coverage as employees. *See* note 8 *supra*. Since it did not, Allstate has made its bed and now must lie in it. Under New Hampshire law, we must construe the policy against the insurer wherever, as here, the policy is ambiguous or separate clauses lend themselves to conflicting interpretations. *Young, supra,* 120 N.H. at 884, 424 A.2d at 206–07.

### IV. Coverage for Loss of Consortium

■ There remains the question of coverage for Cathy Morehouse's loss-of-consortium claim. Allstate denies coverage, claiming that the policy only covers "bodily injury", and that a claim for loss of consortium is not a claim for "bodily injury" under *Bean v. Miller,* 122 N.H. 681, 684, 448 A.2d 424, 426 (1982). We agree.

Although the policy obligates Allstate to defend and pay "*all sums* which the Insured shall become legally obligated to pay as damages *because of* bodily injury" (emphasis added), it does not obligate Allstate to cover suits brought *by third parties* for losses occasioned by a covered bodily injury to another person. In addition, the policy definition limits "bodily injury" to "bodily injury, sickness or disease", and does not cover loss of services related to such an injury. The authorities cited by Diamond are therefore distinguishable. *American Asbestos Textile Corp. v. American Mutual Liability Insurance Co.,* 114 N.H. 806, 808, 330 A.2d 451, 453 (1974) (loss of consortium covered where policy defined coverage to "include damages for care and *loss of serv-*

*ices* and damages for which the insured is liable by reason of suits ... *brought by others* to recover ... damages ... because of such bodily injury sustained by [covered] employees") (emphasis added); I. Long, The Law of Liability Insurance § 4.25 (coverage cannot be restricted to those persons actually suffering bodily injury "[w]hen the controlling words of the policy are 'damages on account of bodily injuries or death suffered *by any person or persons as* a result of an accident" (emphasis added).[9] *See also Lumbermen's Mutual Casualty Co. v. Yeroyan,* 90 N.H. 145, 146, 5 A.2d 726, 727 (1939) (loss of consortium covered where policy covered "all sums which the assured shall become obligated to pay by reason of the liability imposed upon him by law for damages accidentally suffered *by any person* on account of bodily injuries, '*including loss of services in consequence of such injuries'* ") (emphasis added).

*For the foregoing reasons, the judgment of the district court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. Each side will bear its own costs on this appeal.*

---

**9.** The other case cited by Diamond, *American Motorist Ins. Co. v. Kopka,* 88 N.H. 182, 186 A. 335 (1936), involved a father's claim for payment of direct expenses incurred as a result of bodily injury to the insured, his son, and is irrelevant to the loss of consortium issue here.