[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The issue before the court is whether the law of Connecticut or the law of New York governs the consequences of the defendant insurers' alleged breach of their duty to defend their insureds.
The plaintiffs, Reader's Digest Association, Inc. (RDA) and QSP, Inc. (QSP) have brought this action against seven of their primary, umbrella and excess insurance carriers. The plaintiffs seek reimbursement for monies they expended in the settlement of a federal antitrust class action brought against them in California, entitled The Roman Catholic Bishop of San Diego, etal. v. The Reader's Digest Association, Inc., et al., United States District Court, Southern District of California, Docket No. 931953 IEG (CM) (the Bishop action).
RDA is a Delaware corporation with its principal place of business in Pleasantville, New York. It does business nationwide but denies that it transacts business in Connecticut. No other party challenges this representation, nor is there evidence in the record to the contrary.
QSP is a Delaware corporation which, until March, 1998, had its principal place of business in Ridgefield, Connecticut. It is a wholly owned subsidiary of RDA. QSP is in the business of providing magazine fundraising products to schools and youth groups throughout the United States. It assists those groups in CT Page 14423 the sale of publications such as magazine subscriptions, books and recorded music. Orders by schools and youth groups for QSP's fundraising products were subject to final approval from QSP's headquarters in Ridgefield, Connecticut. Shipments of QSP's fundraising products were directed from QSP's Ridgefield, Connecticut headquarters.
For many years, QSP has had a significant business presence in Connecticut. Until March 16, 1998, when it moved its operations to New York, QSP employed more than seventy employees in Connecticut and approximately sixty of these employees lived in Connecticut. During 1995 through 1997, QSP's total Connecticut payroll exceeded $13.5 million, exclusive of fringe benefits totalling over $4 million. During its fiscal years 1993 through 1996, QSP paid Connecticut income taxes in excess of $300,000.
In the Bishop action, the complaining parties alleged that RDA and QSP had "monopolized . . . in violation of section 2 of the Sherman Act, 15 U.S.C. § 2, by deliberately acquiring and maintaining the power to control prices in, and/or to exclude entry from, the school/youth group magazine fund raising market through the use of various anticompetitive, predatory, and exclusionary means." Because the parties' respective characterizations of the Bishop action are contentious, the specific allegations of wrongdoing are reproduced in the footnote.[1]
The Bishop action was a nationwide class action that ultimately included 20,000 schools and other youth groups in the plaintiff class. On October 1, 1996, the parties to the Bishop
action entered into a pre-trial settlement agreement under which RDA agreed to contribute $15,000,000 in cash and $15,000,000 in products. QSP agreed to contribute discounts on future magazine subscriptions, with an estimated value of $10,000,000, or 25% of the estimated settlement value.[2]
The six defendants are in the business of selling comprehensive, umbrella or excess general liability insurance.[3] The defendants American Manufacturers Mutual Insurance Company (AMM) and American Motorists Insurance Company (AMICO) are Illinois corporations, each with a principal place of business in Illinois. The defendant General Star National Insurance Company (Genstar) is an Ohio corporation with a principal place of business in Connecticut. The defendant CT Page 14424 Federal Insurance Company (Federal) is an Indiana corporation with a principal place of business in Indiana. The defendant Fireman's Fund Insurance Company (Fireman's Fund) is a California corporation with a principal place of business in California. The defendant TIG Insurance Company (TIG) is a California corporation with a principal place of business in Texas. All defendants do business nationally, if not internationally. All defendants insured the plaintiffs.
The plaintiffs claim that three of the six defendants, AMM, AMICO and Genstar, breached their duties under comprehensive commercial general liability policies to defend the plaintiffs or pay their defense costs in the Bishop action. The plaintiffs claim that all defendants breached their duties to indemnify the plaintiffs in connection with the settlement of the Bishop
action. The plaintiffs allege that these duties arise out of the coverage provisions for "advertising injury," "advertising offense" and "personal injury" under each policy.[4] The defendants' insurance policies did not contain a choice of law provision, although Genstar's policy did contain several New York endorsements.
RDA employees were solely responsible for procuring, negotiating and renewing the insurance policies that insured RDA and QSP. No QSP employees were involved in these matters. The underwriting process for the defendants' policies occurred in New York. All three insurers' policies were negotiated and made in New York.[5].
 I A.
The plaintiffs have moved that the court hold that the substantive law of Connecticut applies to this action. Although this procedure was used by the Superior Court in Carrier Corp. vHome Ins. Co., 43 Conn. Sup. 182, 648 A.2d 665 (1994), no such motion exists in Connecticut practice. "`The forms of pleadings and the rules governing their use are to be found in the Practice Book . . . Innovations should not be put into practice ex parte by counsel.' Vigue v. John Hancock Mutual Life Ins. Co.,147 Conn. 305, 306, 160 A.2d 484 (1960)." Brookfield v. BoulderSpring Water Co., 196 Conn. 355, 358, 493 A.2d 862 (1985). Here, however, the innovation has not been implemented ex parte; the motion is filed pursuant to a case management order of the court. CT Page 14425 Pre-trial motions to determine the applicable law are not uncommon in other jurisdictions and facilitate the orderly adjudication of the case.[6] The parties have filed comprehensive memoranda and voluminous documents supporting their claims of fact and law. No party has objected to deciding the choice of law issue on the present record. Compare Aetna Casualty Surety Co v. Dow Chemical Co., 883 F. Sup. 1101, 1104
(E.D. Mich. 1995).
"In determining the governing law, a forum applies its own conflict-of-law rules . . ." Gibson v. Fullin, 172 Conn. 407,411, 374 A.2d 1061 (1977). In Reichhold Chemicals, Inc. v.Hartford Accident Indemnity Co., 243 Conn. 401, 703 A.2d 1132
(1997) (hereafter Reichhold), the Connecticut Supreme Court abandoned the traditional test for resolving choice of law issues in contract cases, lex loci contractus. See id., 413. "Under that approach . . . a contract is construed according to the law of the place where the contract was made." Id., 408. The court adopted the Restatement (Second), Conflict of Laws (hereafter Restatement) "most significant relationship" approach to resolving conflict of law questions in contract cases.[7]
 B.
Because the Restatement test adopted by the Reichhold court contemplates that the law of different jurisdictions may apply to different issues in a case; Restatement § 188 (1971); id., comment (d), p. 579; Independent Petrochemical Corporation v.Aetna Casualty Surety Co., 674 F. Sup. 354, 356 (D.D.C. 1987); it is necessary to identify the issue or issues as to which the parties claim there is a conflict of law. The plaintiffs argue that "[t]he key issue in this . . . case is determining the obligations of the primary insurers, AMICO and AMM, as well as the duty of the umbrella insurer Genstar, to defend and/or pay defense costs insured by QSP and RDA in the defense of the underlying Bishop action." The court disagrees; that is only one issue. There are two issues in this action: (1) whether the defendants breached a duty to defend the plaintiffs and pay defense costs in the Bishop action, and, if so (2) what the measure of damages is. The subsidiary issues giving rise to the plaintiffs' motion are (1) whether the defendants' duty to defend the plaintiffs was determinable only from the "four corners" of the complaint in the Bishop action or whether those defendants could look beyond the complaint in making their coverage determinations, and (2) whether, if the defendants breached their CT Page 14426 duty to defend the plaintiffs in the Bishop action, they are liable only for the defense costs incurred by the plaintiffs or whether they are also liable for the amount of a good faith settlement of the Bishop action. The plaintiff argues that Connecticut law governs these issues. The defendants claim that New York law governs.[8]
The plaintiffs maintain that "the scope of the duty to defend presents a `false conflict': both New York and Connecticut law determine the existence of the duty to defend from the four corners of the complaint." "`[F]alse conflict' really means `no conflict of laws.'" Phillips Petroleum Co. v. Shutts,472 U.S. 797, 838 n. 20, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (Stevens, J., concurring in part and dissenting in part). A "false conflict" of laws is said to exist "where application of the laws of two or more jurisdictions with contacts to the litigation reach identical results, thus eliminating any potential conflict of laws." O'Connor v. O'Connor, 201 Conn. 632, 657 n. 18,519 A.2d 13 (1986); see id., 649 n. 10. "In such a case, `the case ought to be decided under the law that is common to both states.'" BostonHides Furs, Ltd. v. Sumitomo Bank Ltd., 870 F. Sup. 1153, 1159
(D. Mass. 1994), quoting R.A. Leflar, American Conflicts of Law § 92 (4th Ed. 1986). "It is only after a determination is made that there is indeed an actual conflict between the laws of the particular jurisdictions that the interests of the respective jurisdictions are analyzed." Grossman v. Club Med Sales, Inc.,273 N.J. Super. 42, 640 A.2d 1194, 1198 (App.Div. 1994).
Under Connecticut law, "an insurer's duty to defend, being much broader in scope and application than its duty to indemnify, is determined by reference to the allegations contained in the complaint . . . The obligation of the insurer to defend does not depend on whether the injured party will successfully maintain a cause of action against the insured but on whether he has, in his complaint, stated facts which bring the injury within the coverage. If the latter situation prevails, the policy requires the insurer to defend, irrespective of the insured's ultimate liability . . . It necessarily follows that the insurer's duty to defend is measured by the allegations of the complaint . . . Hence, if the complaint sets forth a cause of action within the coverage of the policy, the insurer must defend." (Citations omitted; internal quotation marks omitted.)Flint v. Universal Machine Co., 238 Conn. 637, 646-47,679 A.2d 929 (1996); see also Imperial Casualty Indemnity Co. v. State,246 Conn. 313, 323-24, 714 A.2d 1230 (1998). "[I]t is irrelevant CT Page 14427 that the insurer may get information from the insured, or from any one else, which indicates, or even demonstrates, that the injury is not in fact `covered.'" Flint v. Universal Machine Co.,supra, 647. This rule is in accord with the law of New York. SeeCedarhurst v. Hanover Ins. Co., 89 N.Y.2d 293, 298,675 N.E.2d 822 (1996).[9] Therefore, as to the scope of the duty to defend, there is a false conflict.
However, in Connecticut "[w]here an insurer is guilty of a breach of its contract to defend, it is liable to pay to the insured not only his reasonable expenses in conducting his own defense but, in the absence of fraud or collusion, the amount of a judgment obtained against the insured up to the limit of liability fixed by its policy"; Keithan v. Massachusetts Bonding Ins. Co., 159 Conn. 128, 139, 267 A.2d 660 (1970); or the amount of a reasonable settlement entered into by the insured with the injured party in good faith and without fraud. Black vGoodwin, Loomis Britton, Inc., 239 Conn. 144, 153-54,681 A.2d 293 (1996); Alderman v. Hanover Ins. Group, 169 Conn. 603, 611,363 A.2d 1102 (1975); Missionaries of Co. of Mary, Inc. v. AetnaCasualty Surety Co., 155 Conn. 104, 114-15, 230 A.2d 21 (1967) (hereafter Missionaries). This rule, known in Connecticut as "the rule of the Missionaries case"; Keithan v. Massachusetts Bonding Ins. Co., supra, 159 Conn. 141; was first adopted inMissionaries, supra, 112. New York subscribes to a different rule. In New York, "an insurer's breach of duty to defend does not create coverage and . . . even in cases of negotiated settlements, there can be no duty to indemnify unless there is first a covered loss." Servidone Construction Corp. v. SecurityIns. Co., 64 N.Y.2d 419, 423, 488 N.Y.S.2d 139, 477 N.E.2d 441
(1985). "[T]he duty to defend is measured against the allegations of pleadings but the duty to pay is determined by the actual basis for the insured's liability to a third person . . ." Id., 424.[10] The burden of proof, however, "rest[s] with the insurer to demonstrate that the loss compromised by the insured was not within policy coverage." Id., 425. Therefore, there is a conflict of laws as to the consequences of a breach of the duty to defend.
 II
The plaintiffs claim, however, that there is no conflict of laws because "the rule of the Missionaries case," prescribing the consequences of a breach of duty to defend, is a procedural remedy. This court is not persuaded. CT Page 14428
"It is undisputed that, as a principle of universal application, remedies and modes of procedure depend upon the lex fori." (Citations omitted; internal quotation marks omitted.)Baxter v. Sturm, Ruger Co., 230 Conn. 335, 339, 644 A.2d 1297
(1994); see Wood v. Watkinson, 17 Conn. 500, 508-09 (1846);Vermont State Bank v. Porter, 5 Day (Conn.) 316, 320 (1812). The plaintiffs' argument that the consequences of a breach of the duty to defend is procedural find support in Illustrated PostalCard Novelty Co. v. Holt, 85 Conn. 140, 143, 81 A. 1061 (1912), in which the court held that whether the measure of damages for breach of a contract to purchase goods could be the purchase price pertained to "the form of the remedy" and, therefore, was governed by the law of the forum. See also Home Pattern Co. vMertz Co., 86 Conn. 494, 500-01, 86 A. 19 (1913).
The plaintiffs further argue that Connecticut courts have used various terms to characterize "the rule of the Missionaries
case." "Each of these characterizations," argue the plaintiffs, "falls within categories of penalties, procedural rules of the forum, and evidentiary exclusions, categories which traditionally are governed by the law of the forum."
Relying on Paine Webber Jackson Curtis, Inc. v. Winters,22 Conn. App. 640, 651-55, 579 A.2d 545, cert. denied, 216 Conn. 820,581 A.2d 1055 (1990), which held that Connecticut's prejudgment interest statute was punitive and procedural for conflicts-of-law purposes,[11] the plaintiffs first state that "some Connecticut courts have analyzed the Connecticut [r]ule in terms of a `penalty' provision." The plaintiffs, however, cite no authority in support of this statement, nor has the court found any. The characterization was contained in an opinion by the New York Court of Appeals in Servidone Corporation v. Security Ins Co.,supra, 64 N.Y.2d 424, but that description of a Connecticut rule by a court of another jurisdiction is not binding on nor, in this case, persuasive to this court. See State v. Menillo,171 Conn. 141, 147, 368 A.2d 136 (1976) (state is arbiter of its own laws); see also Johnson v. Manson, 196 Conn. 309, 319, 493 A.2d 846
(1985).
The plaintiffs next argue that the rule of the Missionaries
case is based on waiver or is an allocation of a burden of proof, matters which the plaintiffs claim are procedural. InMissionaries, the court stated that "[t]he defendant having, in effect, waived the opportunity which was open to it to perform its contractual duty to defend under a reservation of its right CT Page 14429 to contest the obligation to indemnify the plaintiff, reason dictates that the defendant should reimburse the plaintiff for the full amount of the obligation reasonably incurred by it."Missionaries, supra, 155 Conn. 113-14. The court further opined that an insurer should not "be permitted, by its breach of the contract, to cast upon the plaintiff the difficult burden of proving a causal relation between the defendant's breach of the duty to defend and the results which are claimed to have flowed from it." Id., 114. While notions of estoppel and burden of proof may inform the rationale for the Missionaries rule, they do not necessarily resolve the question of whether that rule is substantive or procedural. See generally Paine Webber Jackson Curtis, Inc. v. Winters, supra, 22 Conn. App. 650-51.
Finally, the plaintiffs argue that the Missionaries rule is evidentiary. The general rule is that the admissibility of evidence relates to procedure; see State v. Almeda,211 Conn. 441, 454, 560 A.2d 389 (1989); and, therefore, is governed by the law of the forum. See State v. Lorain, 141 Conn. 694, 701,109 A.2d 504 (1954); but see Broderick v. McGuire, 119 Conn. 83,101-03, 174 A. 314 (1934); Fish v. Smith, 73 Conn. 377, 393,47 A. 711 (1900). The plaintiffs' argument is based on language inBlack v. Goodwin, Loomis and Britton, Inc., supra,239 Conn. 154, that after breaching its duty to defend an insurer "will not be heard to complain when the insured enters into a settlement agreement"; and on Schurgast v. Schumann, 156 Conn. 471, 490,242 A.2d 695 (1968), wherein the Supreme Court stated that it was not necessary to examine a policy exclusion when the insurer had breached its duty to defend. While the result of the Missionaries
rule may be a barring of certain matters from the court's consideration, that result cannot be mistaken for the rule's rationale.
The measure of damages, at least in tort, has historically been deemed a matter of substance for conflict of laws purposes. See Reilly v. Pepe Co., 108 Conn. 436, 446-47, 143 A. 568 (1928); see also Patch v. Stanley Works, 448 F.2d 483, 490-91 n. 16 (2d Cir. 1971); Marine Midland Bank v. Kilbane, 573 F. Sup. 469, 471
(D. Md. 1983), aff'd, 739 F.2d 958 (4th Cir. 1984); Halstead v.United States, 535 F. Sup. 782, 794 (D. Conn. 1982), aff'd,707 F.2d 671 (1983). In view of the Supreme Court's adoption of Restatement §§ 6, 188 and 193 in Reichhold, this court's disposition of this issue must be informed by the parts of the Restatement that interface with those sections. Part 2 of the introductory note to Chapter 8 of the Restatement,[12] explains CT Page 14430 that "the original Restatement made a sharp distinction between matters of validity and matters of performance, stating that matters pertaining to damages, to sufficiency of performance and to excuse for nonperformance are governed by the local law of the place of contracting. The distinction has now been abandoned, and in the present Chapter all issues involving contracts are said to be governed either by the law chosen by the parties or, in the absence of an effective choice, by the local law of the state which, with respect to the particular issue, has the most significant relationship to the transaction and the parties." (Emphasis added.) Restatement § 207 now provides: "The measure of recovery for a breach of contract is determined by the local law of the state selected by application of the rules of §§ 187-188." For these reasons, in the absence of a choice of law in the parties' policies, the choice of law is governed by "most significant relationship" analysis, § 188[13].
 III
"We begin our choice of law analysis with respect to this particular factual situation by considering, in accordance with § 6(2)(c), whether . . . New York [and Connecticut] have an `interest' in the application of their own [rule of law] to the insurance policies at issue in this case.[14] In order to make that determination, we: (1) identify the policies that underlie each state's [rule of law]; and (2) examine whether those policies would be advanced by the application of the state's . . . law in the present case. See Restatement § 6(2)(c)."Reichhold, supra, 243 Conn. 414. "Every rule of law, whether embodied in a statute or in a common law rule, was designed to achieve one or more purposes. A court should have regard for these purposes in determining whether to apply its own rule or the rule of another state in the decision of a particular issue. If the purposes sought to be achieved by a local statute or common law rule would be furthered by its application to out-of-state facts, this is a weighty reason why such application should be made." Restatement § 6, comment (e); see L. Kramer, "Rethinking Choice of Law," 90 Colum. L. Rev. 277, 296-303 (1990); id., 311 ("A multi-state conflict of laws exists only when contacts are distributed such that more than one state wants to regulate the case."); R.A. Leflar, American Conflicts of Law § 106, p. 295 (4th Ed. 1986) (a state's governmental interest in a case is discoverable by determining if its contacts "give rise to real reasons (socioeconomic or political justifications) for applying the state's law to litigated issues in the case."). CT Page 14431
In determining whether Connecticut has an interest in applying its rule of law, it is necessary to recognize that RDA and QSP are separately named insureds under the defendants' policies. A "named insured" is a person whose name appears on the insurance policy; Ceci v. National Indemnity Co.,26 Conn. App. 661, 663-64, 603 A.2d 412 (1992), reversed on other grounds,225 Conn. 165, 622 A.2d 545 (1993); specifically, on the declarations page. State Farm Mutual Automobile Ins. Co. v. Lindsey, 180 Ariz. 456,885 P.2d 144, 148 (Ariz.App. Div. 1994), reversed on other grounds, 182 Ariz. 329, 897 P.2d 631 (1995). QSP was added to the declarations pages of AMM's and AMICO's policies as a named insured by endorsement. QSP is a named insured on Genstar's policies by virtue of the definition of "named insured" therein.[15] The policies of all three insurers contain severability of interests provisions.[16] "Severability of interests provisions were adopted by the insurance industry to define the extent of coverage afforded by a policy issued to more than one insured . . . Where a policy contains a severability of interests clause, it is a recognition by the insurer that it has a separate and distinct obligation to each insured under the policy . . ." Sacharko v. Center Equities Ltd. Partnership,2 Conn. App. 439, 443-44, 479 A.2d 1219 (1984).
Had RDA and QSP brought separate actions, the court would be required to apply the Restatement test with respect to each named insured. Especially since all three policies have severability of interests clauses, the result should not be different where both named insureds have joined to bring one action. Cf. DiamondInternational Corp. v. Allstate Ins. Co., 712 F.2d 1498, 1501
(1st Cir. 1983) (out-of-state plant of named insured under multiple policy treated as though it were insured by a separate insurance policy). "To conclude otherwise would be to elevate form over substance." CFM of Connecticut, Inc. v. Chowdhury,239 Conn. 375, 391, 685 A.2d 1108 (1996). This is so notwithstanding the extensive control exercised by RDA over QSP's management and operations. "`It is axiomatic that a party is entitled to rely upon its written contract as the final integration of its rights and duties.'" Levine v. Massey, 232 Conn. 272, 279, 654 A.2d 737
(1995), quoting Zullo v. Smith, 179 Conn. 596, 601, 427 A.2d 409
(1980).
For the following reasons, this court concludes that New York has an "interest" in having its rule on the monetary consequences of breaching the duty to defend applied in this case with respect CT Page 14432 to both plaintiffs. First, New York has asserted an interest in circumscribing the consequences of an insurer's breach of its duty to defend. The policy underpinnings of that rule are that to "[hold] the insurer liable to indemnify on the mere `possibility' of coverage perceived from the face of the complaint — the standard applicable to the duty to defend . . . [— would enlarge] the bargained-for coverage as a penalty for breach of the duty to defend, and this it cannot do." Servidone Construction Corp. v Security Ins. Co., supra,64 N.Y.2d 424. "New York courts have found the place of contracting to be more significant than the location of the risk, especially when combined with coinciding contract-related factors such as negotiation of the policies and the location of the insured."Reichhold, supra, 243 Conn. 415. Second, RDA's principal place of business is in New York, and the defendants' policies were negotiated and made in New York. Therefore, "application of New York law would further the protective policy underlying New York's . . . law"; Reichhold, supra, 415; with respect to both plaintiffs.
This court holds that Connecticut does not have an interest in applying its rule of law to RDA's action against the defendants. First, although Genstar has its principal place of business in Connecticut, the Missionaries rule serves to protect insureds from breaches by insurers of the duty to defend by eliminating what the Missionaries court considered to be an "extremely difficult burden of proof." Missionaries, supra,155 Conn. 114. In the Missionaries case, the Connecticut Supreme Court stated: "The defendant having, in effect, waived the opportunity which was open to it to perform its contractual duty to defend under a reservation of its right to contest the obligation to indemnify the plaintiff, reason dictates that the defendant should reimburse the plaintiff for the full amount of the obligation reasonably incurred by it. Arenson v. NationalAutomobile Casualty Ins. Co., 48 Cal.2d 528, 539, 310 P.2d 961
[1955]. The defendant, after breaking the contract by its unqualified refusal to defend, should not thereafter be permitted to seek the protection of that contract in avoidance of its indemnity provisions. Nor should the defendant be permitted, by its breach of the contract, to cast upon the plaintiff the difficult burden of proving a causal relation between the defendant's breach of the duty to defend and the results which are claimed to have flowed from it. Gray v. Zurich Ins. Co.,65 Cal.2d 263, 280, 419 P.2d 168 [1966]. To do so would cast upon the insured not only the unpleasant but the extremely difficult CT Page 14433 burden of proof on the issue whether the defendant's attorneys, by superior skill and wisdom, could have produced a better result at less expense than that achieved by the plaintiff's counsel."Missionaries, supra, 155 Conn. 113-114. RDA itself asserts that it does not do business in Connecticut. While there is a legitimate public interest in the insurance industry; CharlesParker Co. v. Silver City Crystal Co., 142 Conn. 605, 617,116 A.2d 440 (1955); the insurance business is not so invested with public interest that a single breach of duty to defend implicates that interest. "[T]he legislature, which is the source of public policy"; McGlinchey v. Aetna Casualty Surety Co.,224 Conn. 133, 140, 617 A.2d 445 (1992); has not spoken on the subject, although the definition of unacceptable insurer conduct in Connecticut's Unfair Insurance Practices Act, General Statutes § 38a-816(6), reflects the legislative determination that isolated instances of unfair insurance settlement practices are not so violative of the public policy of this state as to warrant statutory intervention. See Lees v. Middlesex Ins. Co.,229 Conn. 842, 850, 643 A.2d 1282 (1994); Mead v. Burns, 199 Conn. 651,663-64, 509 A.2d 11 (1986). Moreover, as observed above, the insurance policies in question were negotiated and made in New York Connecticut has no interest in applying its rule of law to RDA's case. Therefore, New York law applies to RDA's action against the defendants.
Conversely, because QSP had its principal place of business in Connecticut at the time of the defendants' alleged breach of their duty to defend, Connecticut does have an interest in the application of the rule of the Missionaries case to the alleged breach of duty to defend QSP. That is, that the policy underlying the Missionaries rule would be advanced by its application here.[17]
 IV
Because New York and Connecticut have conflicting "interests" with respect to QSP's claim, the court must determine which of those interests gives rise to the "most significant relationship. " Reichhold, supra, 243 Conn. 416. Because the contracts at issue are liability insurance policies, there are two possible provisions of the Restatement that may answer this question. The first, which is espoused by the plaintiffs, is the § 193 special presumption for liability insurance policies. The other, advocated by the defendants, is the general provision in § 188 of weighing enumerated criteria. CT Page 14434
Section 193 of the Restatement provides: "The validity of a contract of fire, surety or casualty insurance and the rightscreated thereby are determined by the local law[18] of the state which the parties understood was to be the principallocation of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied." (Emphasis added.).
"An insured risk is `the object or activity which is the subject matter of the insurance,' and `has its principal location in the state where it will be during at least the major portion of the insurance period.'" Gates Formed FibreProducts v. Plastic-Vac, Inc., 687 F. Sup. 688, 690 (D. Me. 1988), quoting Restatement § 193, comment (b). Here, the activities that are the subject matter of the insurance are the operations of QSP that may result in the commission of acts or "offenses" producing "advertising injury" or "personal injury."
Comment (b) to § 193 provides, inter alia: "An insured risk, namely the object or activity which is the subject matter of the insurance, has its principal location, in the sense here used, in the state where it will be during at least the major portion of the insurance period. In the great majority of instances, the term of a contract of fire, surety or casualty insurance will be relatively brief, and it will usually be possible to predict with fair accuracy where the risk will be located, or at least principally located, during the life of the policy. This will obviously be so when the insurance covers an immovable object, such as a house, or insures the honesty and fidelity of the employees at a particular place of business. This will also usually be so when the subject of the insurance is a chattel . . . And where the honesty and fidelity of a particularperson is the subject of the insurance, the parties will usually know beforehand where he will spend most of his time during the life of the policy.
 * * *
"The location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law provided that the risk can be located, at least principally, in a single state. Situations where this CT Page 14435 cannot be done, and where the location of the risk has less significance, include (1) where the insured object will be more or less constantly on the move from state to state during the term of the policy and (2) where the policy covers a group of risks that are scattered throughout two or more states." (Emphasis added.) Restatement § 193, comment (b), pp. 611-12. Comment (b) to § 193 also recognizes that "[t]here may be no principal location of the insured risk in the case of contracts for the insurance of things . . ." Id., p. 612.
QSP argues that § 193 of the Restatement applies because Connecticut was "the state which the parties understood was to be the principal location of the insured risk during the term of the polic[ies] . . ." Restatement § 193.
The defendants contend that there was no principal location of the insured risk. The defendants argue that § 193 of the Restatement is not simply based on the location of corporate headquarters. They have produced documentation that QSP maintained sales offices in the forty-eight continental United States, and that the defendants' liability policies covered the plaintiffs' activities throughout the United States. Paragraph 17 of the Bishop action, moreover, alleged that QSP's "sales representatives, often referred to as Field Managers, call upon school-related entities and youth groups and obtain their agreement to use QSP's services in conducting fund raising drives based primarily on the sale of magazine subscriptions."
In Reichhold, supra, 243 Conn. 401, the plaintiff brought an action against its insurance companies alleging that those policies obligated the insurers to defend and indemnify the plaintiff with respect to claims arising from chemical contamination at twenty-three sites across the United States.Id., 403-04. "At the time the relevant liability insurance policies were issued, the plaintiff's headquarters were located in New York. The plaintiff negotiated the policies, paid the policy premiums and, in some instances, received payments on claims filed pursuant to the policies through its New York office. The plaintiff's insurance broker was located in New York. The defendants negotiated, executed and administered the policies through their New York offices." Id., 404. "The trial court divided the action into separate jury trials on the basis of site location. The first trial, which [was] the subject of [the] appeal, involved coverage for claims arising from chemical contamination of groundwater at a site in [the state of] CT Page 14436 Washington . . ." Id. A pivotal issue in the case was whether the law of Washington or the law of New York applied to the issue of compliance with the notice of occurrence provisions in the policies. "Although the site is located in Washington, the [trial] court applied New York law." Id., 405.
The Supreme Court held that this was error and that the trial court should have applied the law of the state of Washington. In the course of its analysis, the court, adopting and applying the Restatement, concluded that, for three reasons, "the § 193 special presumption, rather than the § 188 general presumption, should apply in cases involving liability insurance policies that cover immovable risks located in more than one state." (Emphasis added.) Id., 416. "First, § 188(3) indicates that § 193, rather than § 188, is the appropriate section. See 1 Restatement (Second), supra, § 188(3) (if place of negotiation is place of performance, local law of that state will usually be applied `except as otherwiseprovided in §§ 189-199' . . .). Second, both § 193 and comment (a) to that section deal directly with application of the notice law of the state in which the insured risk is located.Id., § 193, comment (a), p. 610 (§ 193 rule applies to questions such as `whether the company is released from liability by reason of the insured's failure to give it prompt notice'). Third, comment (f) to § 193 explicitly discusses liability insurance policies that provide coverage for risks located in more than one state. See id., § 193, comment (f), pp. 613-14 (indicating that courts should treat each risk insured under such policies as separate policy). Accordingly, the § 193 presumption that Washington enjoys the `most significant relationship' is applicable to the notice issue in the present case." Id., 416-17.
This aspect of the Reichhold analysis is of little assistance in resolving whether § 193 applies here. First, the court limited its holding to immovable risks. Second, the court was not called upon to determine, nor did it expressly adjudicate, whether "the parties understood" that the state of Washington, the state encompassing the contaminated site, "was to be the principal location of [one of] the insured risk[s] . . ." Reichhold, supra, 243 Conn. 411. "It is the general rule that a case resolves only those issues explicitly decided in the case." State v. Ouellette, 190 Conn. 84, 91,459 A.2d 1005 (1983); see also Civardi v. Norwich, 231 Conn. 287, 300,649 A.2d 523 (1994). Third, in the present context, to state CT Page 14437 that § 188(3) provides that § 193 controls over § 188 where § 193 is applicable is to state the obvious without illuminating the answer to the question.
Fourth, while comment (a) to § 193 provides that "[t]he law selected by [§ 193] determines such questions as . . . whether in the case of liability insurance the insured can recover from the [insurance] company the cost of defending an action involving a risk covered by the policy" — that is, the law selected by § 193 can determine the consequences for a liability insurer's breach of its duty to defend — neither § 188(3) nor comment (a) to § 193 inform the predicatefactual question for invoking § 193 rather than § 188, whether there was a "state which the parties understood was to be the principal location of the insured risk during the term of the policy . . ." Restatement § 193.
The third reason given by the Reichhold court, which cited comment (f) to Restatement § 193,[19] does not apply here. The liability coverage for QSP did not "provide coverage for risks located in more than one state"; Reichhold, supra, 417; but, rather, provided coverage for one risk spread over many states.
The defendants' policies did not set forth a principal location of the insured risks, but, rather, expressly indicated that the coverage areas were nationwide, indeed worldwide. SeeGeneral Accident Ins. Co. v. Ins. Co. of North America, 69 Ohio App.3d 52,590 N.E.2d 33, 37 (1990). To determine whether § 193 of the Restatement controls this court's analysis, rather than § 188, it is necessary to determine whether there, in fact, was a "state which the parties understood was to be theprincipal location of the insured risk during the term of the policy . . ." (Emphasis added.) Restatement § 193. Since § 193 is a "special presumption"; Reichhold, supra,243 Conn. 411, 416; the burden is on the plaintiff, as the party seeking to invoke it, to prove the predicate facts necessary for its applicability; Patrick v. Bedrick, 169 Conn. 125, 127,362 A.2d 987 (1975); Schiesel v. Poli Realty Co., 108 Conn. 115,120-21, 142 A. 812 (1928); see also Shelnitz v. Greenberg,200 Conn. 58, 73, 509 A.2d 1023 (1986); Potter v. Prudential Ins. Co.,108 Conn. 271, 277, 142 A. 891 (1928); cf. Mullins Coal Co. v.Director, OWCP, 484 U.S. 135, 138, 108 S.Ct. 427,98 L.Ed.2d 450 (1987), rehearing denied, 484 U.S. 1047, 108 S.Ct. 787,98 L.Ed.2d 872 (1988); that is, that there was an understanding and CT Page 14438 what that understanding was.
The word "understood" has been held to be synonymous with "agreed." See Mount v. Board of Commissioners of MontgomeryCounty, 168 Ind. 661, 80 N.E. 629, 630 (1907), and cases cited therein; see generally 43 Words and Phrases (Perm. Ed.), "Understanding," "Understood." However, the word is ambiguous;Sykes v. City Savings Bank, 115 Mich, 321, 73 N.W. 369, 370
(1897); and another "of its accepted meanings is `a mutual agreement not formally entered into but in some degree binding on each side'"; Bridgeport Pipe Engineering Co. v.DeMatteo Construction Co., 159 Conn. 242, 247, 268 A.2d 391
(1970); or an implied agreement. United States v. United ShoeMachinery Co., 234 F. 127, 148 (E.D. Mo. 1916); see alsoHochstetler v. Graber, 78 N.D. 90, 48 N.W.2d 15, 21 (1951) ("understanding" is a broad term and "implies a concept which partakes of a conclusion as a result of [a] transaction").
This court holds that the plaintiffs have not sustained their burden of proof. Whether the word "understood" means "agreed" or "implied," or the word "understanding" means "informal agreement" or "comprehension or awareness," there is no direct or circumstantial evidence of what "the parties understood was to be the principal location of the insured risk during the term of the policy . . ."
QSP argues that: "Discovery in the Bishop [a]ction . . . revealed that virtually all of the alleged actions of defamation, unfair competition, and malicious prosecution giving rise to the underlying liability in the Bishop [a]ction, originated from, or have a substantial nexus with, operations of the Ridgefield, Connecticut-based headquarters of QSP. In fact, all of QSP's important corporate officers were based in the Ridgefield, Connecticut headquarters . . . All of the key business components of QSP, such as finance, marketing, human resources, publisher relations, etc., were based in the Ridgefield, Connecticut headquarters . . . Finally, QSP's non-disparagement policy[20] originated from its Connecticut offices . . ." The documents submitted in support of these claims are QSP's organizational chart, its operations manual and its nondisparagement policy. These documents do not prove QSP's claim that virtually all of the alleged actions of defamation, unfair competition and malicious prosecution complained of in theBishop action, originated from, or have a substantial nexus with, operations of the Ridgefield, Connecticut-based CT Page 14439 headquarters of QSP. More importantly, there is no evidence that this information was ever imparted to the defendants at the time the respective policies were being issued or renewed — or, for that matter, at any time prior to the parties undertaking discovery in this action. Therefore, those documents and the information they contain could not have been the basis of an understanding between QSP and its insurers as to the principal location of the insured risk. "The court will not use hindsight in determining what the parties understood to be the principal location of the insured risk. It is this understanding at the time that the policies were issued [or renewed] that determines which state's law shall govern." Gahagen Iron Metal Co. vTransportation Ins. Co., 812 F. Sup. 1106, 1108 (D. Colo. 1992); see also Raydrop v. Second National Bank,120 Conn. 322, 328, 180 A. 469 (1935).
Indeed, there is little or no evidence in the underwriting documents that the defendants knew where QSP's headquarters was located prior to the commencement of the Bishop action[21] In this connection, it is notable, though not controlling, that QSP did not purchase its insurance. This was done by RDA through New York brokers, agents and wholesalers. QSP was one of nearly two dozen wholly owned subsidiaries of RDA that was added by endorsement as named insured to the defendants' policies.[22]
Especially since QSP was essentially a service business with offices and sales representatives throughout the country, it would be indulging in sheer fiction to hold that there was any understanding between the parties as to the principal location of the insured risk.[23] The only other means by which § 193 may be invoked is by reading the word "understood" out of that section completely, an alternative not available to this court.
Diamond International Corp. v. Allstate Ins. Co.,712 F.2d 1498 (1st Cir. 1983), on which the plaintiffs rely, does not militate a contrary result. In Diamond, an employee of Groveton Papers Company (Groveton) suffered serious injuries to his arm and hand while operating a machine at the company's New Hampshire plant. See id., 1499-1500. Groveton was a wholly owned subsidiary of Diamond International Corp. (Diamond) which had purchased a comprehensive general liability policy from Allstate which extended coverage to Diamond's subsidiaries. See id., 1499. Diamond brought a declaratory judgment action to determine that the Groveton employees who had been sued for the accident were covered. See id. It contended that New York law applied while Allstate claimed that New Hampshire law applied. There was no CT Page 14440 dispute that "New Hampshire [was] the state which is the principal location of the insured risk . . ." See id., 1500 Indeed, it appears that it could not have been elsewhere. The questions on which the choice of law devolved were whether New Hampshire adhered to the Restatement tests and whether the parties intended that New York law apply. See id., 1501-02. Here, by contrast, QSP does not simply do business at one site; through its representatives it does business in and has a presence in every state. The insured risks of personal injury and advertising injury were not localized in QSP's Ridgefield, Connecticut headquarters but existed in every state. See O'Neill v. YieldHouse, Inc., 964 F. Sup. 806, 810 (S.D.N.Y. 1997). In fact, the injuries claimed in the Bishop action occurred in many states.
This is not to say that Connecticut might not have been the principal location of the insured risk. It is to say that the plaintiffs have not proven that this was understood by the contracting parties at the time the policies were issued or renewed. See Compagnie des Bauxites v. Argonaut-Midwest Ins.Co., 880 F.2d 685, 690 (3d Cir. 1989).
 V
Since the § 193 presumption is inapplicable, it is necessary to turn to §§ 6 and 188 of the Restatement. SeeAmerican Family Life Assurance Co. v. U.S. Fire Co.,885 F.2d 826, 833 (11th Cir. 1989); Compagnie des Bauxites v.Argonaut-Midwest Ins. Co., supra, 880 F.2d 690; Fallon v.Superior Chaircraft Corp. , 884 F.2d 229, 233 (5th Cir. 1989);Gilbert Spruance Co. v. Pennsylvania Manufacturers Assn. Ins.Co., 134 N.J. 96, 112-113, 629 A.2d 885 (1993)
 A.
Section 188 of the Restatement provides in relevant part: "(2) . . . In the absence of an effective choice of law by the parties . . . the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
"(a) the place contracting,
"(b) the place of negotiation of the contract,
"(c) the place of performance,
CT Page 14441
"(d) the location of the subject matter of the contract, and
 "(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
"These contacts are to be evaluated according to their relativeimportance with respect to the particular issue.
"(3) If the place of negotiating the contract and the place of performance are in the same state, local law of this state will usually be applied . . ." (Emphasis added.)
As the italicized language mandates, "[d]eciding which state has the most significant relationship . . . involves more than totalling numbers of contacts. The Restatement urges courts to evaluate these contacts `according to their relative importance with respect to the particular issue.' Restatement § 188(2)."Rush Presbyterian St. Luke's Medical Center v. Safeco Ins.Co., 712 F. Sup. 1344, 1350 (N.D. Ill. 1989). That is, the § 6 factors are tethered to § 188 contacts. This court will first identify the § 188 contacts.
 Place of Contracting
As discussed above, New York was the place of contracting for all three insurance policies. However, "[s]tanding alone, the place of contracting is a relatively insignificant contact." Restatement § 188, comment (e), pp. 579-80.
 The Place of Negotiation of the Contract
"The place where the parties negotiate and agree on the terms of their contract is a significant contact. Such a state has an obvious interest in the conduct of the negotiations and in the agreement reached." Restatement § 188, comment (e), p. 580. Here, the record reflects that the policies of insurance were entirely negotiated in New York by RDA with and through its agents and brokers.
 The Place of Performance
The Restatement does not define the term "place of performance." Some jurisdictions hold that the place of performance for an insurance policy, unless the policy explicitly CT Page 14442 provides otherwise, is where the premiums are received. SeeArmotek Industries, Inc. v. Employers Ins. of Wausau,952 F.2d 756, 761 (3d Cir. 1991); Gould Inc. v. Continental Casualty Co.,822 F. Sup. 1172, 1176 (E.D. Pa. 1993). Connecticut has no such bright-line rule. But see Teleco Oilfield Services, Inc. v.Skandia Ins. Co., 656 F. Sup. 753, 758 (D. Conn. 1987) ("[B]ecause claims under the . . . [p]olicy were to be paid in Connecticut, the alleged failure to make such a payment is deemed to have occurred in Connecticut.")
The first Restatement defined place of performance as "the state where, either by specific provision or by interpretation of the language of the promise, the promise is to be performed." Restatement (First), Conflicts of Laws § 355 (1934). In the context of this rule, "the promise to be performed" is that of the party who allegedly breached the contract. Liberty MutualIns. Co. v. Vanderbush Sheet Metal Co., 512 F. Sup. 1159, 1167
(E.D. Mich. 1981). Application of this definition makes sense here. In this case, the promise to be performed was the duty to defend.
The place of performance has no weight here, however, for two reasons. First, viewed from the time of contracting, the place or places where the defendants would have to discharge their duties to defend was unknown. "The place of performance can bear little weight in the choice of the applicable law when (1) at the time of contracting it is either uncertain or unknown, or when (2) performance by a party is to be divided more or less equally among two or more states with different local law rules on the particular issue." Restatement § 188, comment (e), p. 580. Second, viewed from the time of the alleged breach, the duties should have been discharged in California, in the defense of theBishop action. However, no party advocates nor desires that this court apply California law. Under such circumstances, the court will not consider California to be a contact to be taken into account in applying the principles of § 6 to determine the law applicable to the issue of damages. See LittonIndustries Credit Corp. v. Catanuto, 175 Conn. 69, 73-74 n. 1,394 A.2d 191 (1978).
 Location of the Subject Matter of the Contract
Because this criterion is one of universal application, and not limited to liability insurance, it does not employ the same language as does § 193. However, the Official Comment CT Page 14443 indicates that the same concept as "principal location of the insured risk" is contemplated. Restatement § 188, comment (e), pp. 580-81. Because, as discussed in part IV, the plaintiffs have not proven that there was a principal location of the insured risk, neither is there a location of the subject matter of the insurance contract.
 Place of Incorporation, Place of Business
"These are all places of enduring relationship to the parties. Their significance depends largely upon the issue involved and upon the extent to which they are grouped with other contacts . . . [T]hat one of the parties is domiciled or does business in a particular state assumes greater importance when combined with other contacts . . . At least with respect to most issues, a corporation's principal place of business is a more important contact than the place of incorporation . . ." Restatement § 188, comment (e), p. 581.
QSP is a Delaware corporation with a principal place of business in Connecticut. AMM and AMICO are both Illinois corporations with principal places of business in Illinois. Genstar is an Ohio corporation with a principal place of business in Connecticut.
The defendants argue that the court should disregard that Connecticut was QSP's principal place of business, indeed disregard QSP's separate corporate identity, because QSP was a wholly-owned subsidiary of RDA and, in fact, its management was substantially controlled by RDA. The court disagrees for two reasons. First, QSP is a separate named insured under each of the defendants' policies and each policy contained a severability of interests clause. As discussed above, such a clause "is a recognition by the insurer that it has a separate and distinct obligation to each insured under the policy . . ."Sacharkov. Center Equities Ltd. Partnership, supra, 2 Conn. App. 444. Having undertaken to deal with each insured separately, the defendants cannot now assert that the corporate identity and residence of QSP may not be regarded by the court. Secondly, courts disregard corporate identity "only under exceptional circumstances"; De Leonardis v. Subway Sandwich Shops, Inc.,35 Conn. App. 353, 358, 646 A.2d 230, cert. denied, 231 Conn. 925,648 A.2d 162 (1994); "[w]hen the statutory privilege of doing business in the corporate form is employed as a cloak for the evasion of obligations, as a mask behind which to do injustice, CT Page 14444 or invoked to subvert equity . . ." Id., 358-59 n. 3. That is not the case here.
Thus, New York's contacts are that it is the state of negotiation of the insurance policies and the state of contracting, only. Connecticut's contacts are that it is the principal place of business of QSP and Genstar.
 B.
Section 6 of the Restatement enumerates the principles for determining which of the contacts enumerated in § 188 "has the most significant relationship to the transaction and the parties . . ." Restatement § 188(1).[24] "Section 6 factors are `choice-influencing factors which a court should consider in choosing the applicable law.' Gordon v. Kramer, 124 Ariz. . 442, 443-44, 604 P.2d 1153, 1154-55 (Ct.App. 1979)."Smith v. Hughes Aircraft Co. Corp. , 783 F. Sup. 1222, 1227
(D.Ariz. 1991). Section 6(1) of the Restatement provides: "A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law." Section 6(2) contains a list of nonexclusive factors relevant to the choice of law "when there is no such directive . . ." They are:
"(a) the needs of the interstate and international systems,
"(b) the relevant policies of the forum,
 "(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
"(d) the protection of justified expectations,
 "(e) the basic policies underlying the particular field of law,
"(f) certainty, predictability and uniformity of result, and
 "(g) ease in the determination and application of the law to be applied." Restatement § 6(2). The Restatement further provides that these principles or factors must be applied to the relevant contacts.
 Needs of the Interstate and International Systems
CT Page 14445
The first principle enumerated in § 6(2) is "the needs of the interstate and international systems." Restatement § 6(2)(a). "Probably the most important function of choice-of-law rules is to make the interstate and international systems work well. Choice-of-law rules, among other things, should seek to further harmonious relations between states and to facilitate commercial intercourse between them." Restatement § 6, comment (d), p. 13. As observed above, New York has asserted an interest in circumscribing the consequences of an insurer's breach of its duty to defend and deems the place of contracting (here, New York) a significant factor in choice of law, "especially when combined with coinciding contract-related factors such as negotiation of the policies . . ." Reichhold,supra, 243 Conn. 414-15. However, concern for the needs of the interstate system does not weigh so heavily here where neither the insured, QSP, nor the defendant insurers have a principal places of business. Flintkote Co. v. American Mutual LiabilityIns. Co., 103 App. Div. 2d 501, 506, 480 N.Y.S.2d 742 (1984). Application of Connecticut law to the issue of damages in this case will not likely affect the juridical, commercial or other relations between New York and Connecticut.[25]
 Relevant Policies of the Forum
The second factor relevant to choice of law in § 6 is "the relevant policies of the forum." Restatement § 6(2)(b).
"Every rule of law, whether embodied in a statute or in a common law rule, was designed to achieve one or more purposes. A court should have regard for these purposes in determining whether to apply its own rule or the rule of another state in the decision of a particular issue. If the purposes sought to be achieved by a local . . . common law rule would be furthered by its application to out-of-state facts, this is a weighty reason why such application should be made." Restatement § 6, comment (e), p. 14.
As discussed above, the purpose of the Missionaries rule is to protect insureds from insurers, breaches of the duty to defend by eliminating what the Missionaries court considered to be an "extremely difficult burden of proof." Missionaries, supra,155 Conn. 114. The "out-of-state facts" are that all three insurance policies were issued in New York. Where, as here, the insured has a principal place of business in Connecticut, the CT Page 14446 purpose sought to be achieved by the Missionaries rule would be significantly furthered by its application to these facts.
 Relevant Policies and Interests of Other States
Section 6(2)(c) of the Restatement also requires the court to weigh "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue." As discussed above, New York has asserted an interest in circumscribing the consequences of an insurer's breach of its duty to defend. However, neither QSP nor the defendants are New York corporations nor do they have a principal place of business in New York. Moreover, the conflict of laws here pertains to a common law rule of damages, not to a term of in the insurance contract, as in Reichhold; see Reichhold, supra,243 Conn. 405 n. 5; which the parties might have drafted with an eye to the law of a particular jurisdiction.
 Protection of Justified Expectations
"This is an important value in all fields of the law, including choice of law. Generally speaking, it would be unfair and improper to hold a person liable under the local law of one state when he had justifiably molded his conduct to conform to the requirements of another state." Restatement § 6, comment (g), p 15.
On October 27, 1994, Connie Beck, Vice President, Corporate Secretary and Associate General Counsel of RDA, and secretary of QSP, wrote to Ronald W. Ferris, Branch Manager of Kemper National Insurance Companies, protesting AMM's and AMICO's refusal to defend RDA and QSP in the Bishop case. After setting forth her analysis of the coverage question, Ms. Beck stated: "We believe that there is coverage for the Bishop action under any relevant law, including New York and California law. The scope of the insurers' duty to defend should, however, be governed by New York law, because it is plain that the places of contracting, of performance, of the business of the insured and of the insurers' agent (Johnson Higgins) are all in New York." The letter clearly was written on behalf of both plaintiffs.
Beck's letter is revealing in its wholesale disregard of QSP — its identity and principal place of business — by an officer of both corporations in the analysis of this issue. However, in the absence of a claim of waiver or estoppel, Beck's CT Page 14447 letter does not estop the plaintiffs from insisting that each plaintiff be treated in accordance with the separability provisions of the policies. "It is axiomatic that a party is entitled to rely upon its written contract as the final integration of its rights and duties." Zullo v. Smith, supra,179 Conn. 601. Nor in the absence of an estoppel does Beck's letter preclude the plaintiffs from maintaining a different position here as to the applicable law.
Beck's letter is some evidence of the reasonable expectations of the plaintiffs.[26] However, "[p]rotection of justified expectations plays a less significant role in the choice-of-law process with respect to issues that involve the nature of obligations imposed by a contract upon the parties rather than the validity of the contract or of some provision thereof." Restatement § 188, comment (b), p. 577.
 Basic policies underlying particular field of law
"This factor is of particular importance in situations where the policies of the interested states are largely the same but where there are nevertheless minor differences between their relevant local law rules. In such instances, there is good reason for the court to apply the local law of that state which will best achieve the basic policy, or policies, underlying the particular field of law involved. This factor explains in large part why the courts seek to apply a law that will sustain the validity of a contract against the charge of commercial usury (§ 203) or the validity of a trust of movables against the charge that it violates the Rule Against Perpetuities (§§ 269-270)." Restatement § 6, comment (h), p. 15. The parties have not identified any basic policy of insurance law that is implicated in this conflicts of law question. To the extent thatMissionaries and Servidone Construction Corp. v. Security Ins.Co., supra, 64 N.Y.2d 424, articulate basic policies of the insurance law of Connecticut and New York, respectively (see discussion, supra, pp. 22-24), those conflicting policies offset each other.
 Predictability and Uniformity of Result
These factors undoubtedly militate in favor of the application of New York law which clearly applies to RDA's claim Predictability and uniformity of result "are important values in all areas of the law. To the extent that they are attained in CT Page 14448 choice of law, forum shopping will be discouraged. These values can, however, be purchased at too great a price. In a rapidly developing area, such as choice of law, it is often more important that good rules be developed than that predictability and uniformity of result should be assured through continued adherence to existing rules. Predictability and uniformity of result are of particular importance in areas where the parties are likely to give advance thought to the legal consequences of their transactions." Restatement § 6, comment (i), pp. 15-16. There is no reason to believe that the parties gave any advance thought to the standard for damages in the event the defendants breached their duties to defend their insureds. Moreover, the Supreme Court has cautioned against giving this factor undue weight. Reichhold, supra, 243 Conn. 419 n. 14.
 Ease in Determination and Application of Law to be Applied
"Ideally, choice-of-law rules should be simple and easy to apply. This policy should not be over-emphasized, since it is obviously of greater importance that choice-of-law rules lead to desirable results. The policy does, however, provide a goal for which to strive." Restatement § 6, comment (j), p. 16. Since the court must in any event apply New York law in the determination of RDA's claim, this factor is rendered nugatory.
In summary, the § 6 factor favoring application of Connecticut law is that which assesses the relevant policies of the forum state, which are articulated in the Missionaries case. The factor which favors New York is its interest in circumscribing the consequences of an insurer's breach of duty to defend, as articulated in Servidone, discussed above. All other factors are relatively inconsequential. Connecticut's interest is tethered to QSP's (and Genstar's) having a principal place of business in Connecticut. New York's interest is bound to the defendants' negotiation and issuance of the insurance policies. Were the issue whether the parties made a valid contract, New York law might well apply. See Restatement, § 188, comment (e), pp. 579-80. However, since the issue is what the consequences of the insurers' breach of duty to defend shall be, Connecticut, as the state of residence of the beneficiary of that duty has the greater interest in applying its law. See Nortek,Inc. v. Liberty Mutual Ins. Co., 858 F. Sup. 1231, 1235 (D.R.I. 1994). The § 188 "contacts are to be evaluated according to their relative importance with respect to the particular issue." Restatement § 188. "As courts have stated, it is not the CT Page 14449 number of contacts with a particular state that is determinative, but the qualitative nature of the particular contacts insofar as they implicate important state policies underlying the particular substantive issue." Hull Co., Inc. v. Chandler,889 S.W.2d 513, 518 (Tex.App. 1994). Connecticut certainly has an important interest in seeing that insurers doing business in Connecticut with Connecticut insureds discharge their duty to defend. Cf. CBS, Inc. v. Film Corp. of America,545 F. Sup. 1382, 1387 (E.D. Pa. 1982) ("New York certainly has an interest in seeing that agreements are kept with companies doing business in New York . . ."). Since the discharge of that duty is closely related to the consequences for its breach, Connecticut law governs the issue here.
This conclusion as to choice of law, which may be counter-intuitive to those steeped in the doctrine of lex loci contractus, is what the Restatement analysis produces. It also is peculiarly the result of the separability clauses in the defendants' insurance policies and the parties' unanimous rejection of the applicability of California law.
In conclusion, there is no conflict of laws with respect to the scope of the duty to defend since the laws of Connecticut and New York coincide on this issue. There also is no conflict of laws with respect to what state's law will govern as to the consequences of RDA's claim of breach of duty to defend. Only New York (not Connecticut) has an "interest" in the application of its law to the consequences of the alleged breach of the duty to defend RDA. Therefore, New York law controls RDA's claim as to this issue. Finally, this court concludes that Connecticut law governs the issue of the consequences of the defendants' alleged breach of the duty to defend QSP.
BY THE COURT
Bruce L. LevinJudge of the Superior Court